UNITED STATES of America, Plaintiff–Appellee,

v.

William R. WILSON, Defendant–Appellant.

No. 92–50585.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1993.

Decided Sept. 14, 1993.

As Amended on Denial of Rehearing or Clarification Nov. 3, 1993.

Michael J. Dowd, Erb & Dowd, San Diego, CA, for defendant-appellant.

Patrick K. O'Toole, Asst. U.S. Atty., argued and on brief, Michael G. Wheat, Asst. U.S. Atty., on the brief; San Diego, CA, for plaintiff-appellee.

Before: BROWNING, TANG, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

William Ralph Wilson appeals his convictions and sentences following two jury trials. We affirm the convictions but remand for resentencing because the district court failed

to state its reasons for sentencing Wilson at the top of the applicable guideline range.

## FACTS AND PROCEEDINGS

At approximately 8:00 p.m. on July 29, 1991, United States Border Patrol Agent Teeple stopped a 1987 Pontiac Firebird at the San Clemente Border Patrol Checkpoint. The car was driven and owned by Mary Darlene Akin; Wilson was a passenger. Akin appeared to be extremely nervous and disoriented, and asked Agent Teeple why he had stopped the car. Agent Teeple noticed that Wilson was sitting hunched over in the passenger seat, staring straight ahead, holding his hands closely together in his lap, and moving his fingers in a fumbling motion. Wilson did not look at Agent Teeple when the agent questioned him. Based on Akin's nervous behavior and Wilson's peculiar conduct, Agent Teeple referred the car to secondary inspection.

In the secondary inspection area, Border Patrol Agent Kocan asked Akin and Wilson about their citizenship and ordered them to get out of the car. About 15 seconds after the car arrived at secondary inspection, Agent Teeple, who had finished his rotation in primary inspection, asked Akin for permission to conduct a canine exterior sniff of the car. Akin consented. When Agent Teeple walked the dog around the car, the dog alerted on the passenger and driver's side doors. The dog is trained to detect hidden narcotics and humans. Agent Teeple then asked Akin's permission to search the interior of the car, and again Akin consented. The search of the car revealed a packet of rolling papers, a short section of plastic straw commonly used to snort methamphetamine or cocaine, and a plastic bag containing a white powdery residue that Agent Teeple recognized by smell as methamphetamine.

While Agent Teeple conducted the search, Agent Kocan watched Akin and Wilson. Wilson's behavior appeared to change after the canine alert, and he seemed extremely nervous. Agent Kocan observed that Wilson was wearing a fleece-lined dungaree jacket, which Agent Kocan found inconsistent with Wilson's short pants and the warm summer evening. Wilson's arms were stiffly crossed and his hands were in the jacket pockets. Agent Kocan requested that Wilson remove his hands from his pockets. Wilson did not do so. The agent repeated his request two or three times, but Wilson did not comply. Hearing Agent Kocan's unanswered demands, Agent Teeple exited the car and observed Agent Kocan backing away from Wilson, still ordering him to show his hands. Finally, Wilson reluctantly removed his hands from his pockets. Both agents noticed that one side of Wilson's jacket hung down lower than the other, as if something heavy or bulky was on that side. Agent Kocan ordered Wilson to remove his jacket. As Wilson handed the jacket to Agent Kocan, the agent noticed that the jacket felt inordinately heavy and observed a slit in the lining. Agent Kocan then felt a hard object inside the lining. He removed a small brown pouch containing the hard object and opened it. The pouch contained a large folding combat-style knife, a smaller pocket knife, a telephone pager, syringes and other assorted narcotics paraphernalia, and several plastic baggies containing a substance that field-tested positive for methamphetamine. Wilson was then arrested and handcuffed.

When Wilson was strip-searched at the police station, a loaded .38 caliber two-shot chrome pistol fell from the crotch of his shorts. A forensic analysis of the substance found in the brown pouch revealed that the baggies contained approximately 13 grams of 78–79% pure methamphetamine.

Wilson pleaded not guilty to a three-count indictment charging him with (1) being a felon in possession of a firearm and an armed career criminal (18 U.S.C. §§ 922(g)(1), 924(a), 924(e)), (2) possessing methamphetamine with intent to distribute (21 U.S.C. § 841(a)(1)), and (3) carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)). The district court denied Wilson's motion to suppress the evidence seized at the checkpoint without conducting an evidentiary hearing. Wilson's first trial began on March 3, 1992, and resulted in a guilty verdict on count 1. The court declared a mistrial as to the other two counts when the jury was unable to reach a verdict. A second trial began on May 4, 1992, and the

jury returned guilty verdicts on counts 2 and 3.

On August 24, 1992, Wilson filed written objections to the presentence report ("PSR"), challenging the determinations that he qualified as an "armed career criminal" under 18 U.S.C. § 924 and that he possessed over 10 grams of "pure" methamphetamine at the time of his arrest. On August 28, 1992, Wilson filed a motion for an evidentiary hearing to determine whether the jury in the first trial relied on an alleged comment by the district court in reaching its verdict. On September 11, 1992, the district court denied Wilson's objections to the PSR and motion for an evidentiary hearing, and sentenced Wilson to 387 months imprisonment.

## DISCUSSION

### I. Motion to Suppress

■■■ Wilson argues that the district court erred in denying his motion to suppress the evidence seized from the checkpoint searches. "Whether detention at a permanent immigration checkpoint violates an individual's Fourth Amendment rights is a question of law reviewed de novo." *United States v. Koshnevis,* 979 F.2d 691, 693 (9th Cir. 1992). A district court's decision whether to hold an evidentiary hearing on a motion to suppress is reviewed for abuse of discretion. *United States v. Mejia,* 953 F.2d 461, 465 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1983, 118 L.Ed.2d 581 (1992). Testimony given at trial may be used to sustain the denial of a motion to suppress, even if the testimony was not presented at the motion hearing. *United States v. Sanford,* 673 F.2d 1070, 1072 (9th Cir.1982).

### A. Referral to Secondary Inspection

■■■ Wilson first claims that no immigration purpose justified referring the car to the secondary inspection area. A vehicle may be stopped at permanent immigration checkpoints for brief initial questioning and referred to a secondary inspection area for

further questioning "in the absence of any individualized suspicion." *United States v. Martinez–Fuerte,* 428 U.S. 543, 562, 96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116 (1976); *see United States v. Barnett,* 935 F.2d 178, 180 (9th Cir.1991).[1] *Martinez–Fuerte* dealt only with immigration-related stops and did not address the legality of investigating for drugs at immigration checkpoints. *Barnett,* 935 F.2d at 181. We will not inquire into an agent's subjective purpose in referring a car to secondary inspection, however, absent objective evidence supporting a charge of pretext. *Koshnevis,* 979 F.2d at 694; *Barnett,* 935 F.2d at 181.

■■ As evidence that referring the car to secondary inspection was a pretext for a narcotics search, Wilson claims that (1) Agent Teeple spoke to Akin and was able to look inside the car during the primary inspection; (2) the agents never asked to look in the hatchback area of the car; (3) Agent Kocan testified that he intended to conduct a canine exterior sniff as soon as the car was referred to secondary inspection; and (4) no agent questioned Wilson regarding his citizenship. None of these factors indicates that the referral to secondary inspection was pretextual. Agent Teeple observed that Wilson and Akin were extremely nervous. Although Teeple could see both of them in the car, he could not determine at primary inspection whether any illegal aliens were hidden in the car. The agents' failure to search the hatchback is not significant given that the Firebird has a window over the back that allows vision into the trunk area. Moreover, running the detector dog constituted a search of the entire car, including the hatchback. The immediate use of a dog in secondary inspection is not evidence of pretext, as the dog is trained to detect hidden persons as well as drugs. Finally, although both agents testified that Agent Kocan asked Wilson his citizenship, a failure to ascertain Wilson's citizenship would have been irrelevant to the valid immigration purpose of investigating alien smuggling.[2]

---

1. Checkpoint searches must be justified by consent or probable cause. *Martinez–Fuerte,* 428 U.S. at 567, 96 S.Ct. at 3087.

2. *Martinez–Fuerte* implicitly recognized that checkpoints may be used to investigate alien smuggling as well as alien status. *See Martinez–Fuerte,* 428 U.S. at 552, 96 S.Ct. at 3080 (checkpoints "operate on a coordinated basis designed

A lack of certainty as to the reason for nervous behavior or the nature of suspected contraband does not amount to pretext. Because Agent Teeple testified that the referral to secondary inspection was for a further immigration inspection, and because *Wilson* presents no evidence suggesting that this was not the case, the referral to secondary inspection was valid even in the absence of articulable suspicion. *Barnett*, 935 F.2d at 181–82.

## B. Detention in Secondary Inspection

Wilson next argues that once the secondary immigration inspection ended, any further detention was illegal. Wilson apparently assumes that the immigration inspection was finished once the agents were satisfied as to his and Akin's citizenship. This premise is erroneous because the agents were not satisfied that aliens were not concealed in the car. *See United States v. Preciado–Robles*, 964 F.2d 882, 884 (9th Cir. 1992) (driver's nervous demeanor during secondary inspection provided sufficient basis for pursuing immigration inspection by requesting permission to search car even after driver and passenger produced valid immigration documents).

Moreover, a brief detention at a permanent checkpoint beyond the time required for immigration purposes is legal if predicated on an articulable suspicion or a minimal showing of suspicion of criminal activity. *Id.; United States v. Taylor*, 934 F.2d 218, 220–21 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992). In *Taylor* and *Preciado–Robles,* such a further detention was upheld because the defendants had become increasingly nervous during secondary inspection. Similarly, Wilson's and Akin's erratic behavior was sufficiently suspicious to allow the agents to detain them for the extremely brief period before the agents requested Akin's permission for the canine sniff. Thus, even assuming that the immigration inspection was concluded prior to the canine sniff, the brief detention at secondary for a narcotics investigation was valid.

## C. Search of Wilson

Wilson also argues that the border agents did not have reasonable suspicion to frisk him. This argument is ludicrous. The dog alerted to the presence of contraband in the car. Wilson's inappropriate clothing, heightening nervousness, repeated refusal to show his hands, and apparent possession of a heavy or bulky object on one side of his jacket constituted specific facts creating a reasonable suspicion that Wilson was armed and presently dangerous. The pat-down of Wilson was permissible under *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968).

## D. Evidentiary Hearing

Finally, Wilson contends that the district court erred by failing to conduct an evidentiary hearing on his motion to suppress. "An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." *United States v. Walczak,* 783 F.2d 852, 857 (9th Cir.1986). "A hearing is not required if the grounds for suppression consist solely of conclusory allegations of illegality." *United States v. Licavoli,* 604 F.2d 613, 621 (9th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980).

Wilson's declaration submitted in support of the motion to suppress and the points and authorities submitted in support

---

to avoid circumvention by smugglers and others who transport the illegal aliens"); *id.* at 557, 96 S.Ct. at 3082–83 ("Routine checkpoint inquiries apprehend many smugglers and illegal aliens who succumb to the lure of such highways."); *id.* (reasonable suspicion requirement "would largely eliminate any deterrent to the conduct of well-disguised smuggling operations, even though smugglers are known to use these highways regularly"). According to the testimony of Supervi-

sory Border Patrol Agent Prat, approximately 20% of the alien smugglers apprehended at the checkpoint are non-Hispanic. *See United States v. Taylor,* 934 F.2d 218, 219 (9th Cir.1991) (non-Hispanic driver properly referred to secondary inspection based on agent's suspicion that vehicle contained undocumented aliens or narcotics), *cert. denied,* —— U.S. ——, 112 S.Ct. 971, 117 L.Ed.2d 136 (1992).

of and in opposition to the motion indicate no contested issue of fact sufficient to require an evidentiary hearing. Wilson's declaration states that agents stopped the car at the checkpoint, asked some perfunctory questions, and ordered the car to the secondary inspection area. Wilson and Akin were then asked to exit the automobile, and after "some delay" a dog was produced and began barking. Wilson then saw agents looking through the car but was unsure what, if anything, they retrieved. He finally states that he was patted down shortly thereafter, and that an agent took his jacket. Although Wilson's declaration omits some pertinent points (for example, Akin's consent to the searches and his refusal to show his hands), none of the specific facts that he includes conflicts with those set forth by the government. Similarly, Wilson's memorandum of points and authorities suggests no specific and material contested issues of fact, but raises the same legal arguments presented on this appeal. The district court did not abuse its discretion in denying Wilson's request for an evidentiary hearing.

## II. Evidentiary Hearing on Extrinsic Evidence

Shortly before sentencing, Wilson filed a motion for an evidentiary hearing to determine whether the jury had considered extrinsic evidence at his first trial. The evidence at issue was a comment allegedly made by the district court immediately following the testimony of Thomas Welch, Wilson's brother-in-law. Welch testified about retrieving Wilson's car from the Del Mar racetrack on the day after Wilson's arrest. Nearly six months later, Welch and his wife Peggy (Wilson's sister) submitted affidavits stating that, after Welch had left the stand and had taken his seat in the back of the courtroom, they had heard the judge say to himself, "That doesn't wash; that just doesn't wash." The judge had been looking through papers on the bench when he allegedly made the comment, but the Welches believed that the comment referred to Thomas Welch's testimony. Peggy Welch stated that she had brought the

comment to the attention of Wilson's attorney later that morning.

■■ The judge denied Wilson's motion for an evidentiary hearing, stating that he had not made the comment and that, even if he had, it had not been addressed to the witness. Wilson argues that the district court erred in denying the motion. The denial of a motion for an evidentiary hearing regarding allegations that a jury improperly considered extrinsic evidence is reviewed for abuse of discretion. *United States v. Navarro-Garcia*, 926 F.2d 818, 822 (9th Cir.1991). "An evidentiary hearing must be granted unless the alleged misconduct could not have affected the verdict or the district court can determine from the record before it that the allegations are without credibility." *Id.*

■ In this case, the alleged extrinsic evidence was attributed to the judge himself, who was in the best position to determine whether the statement was made. Other facts cast doubt on the credibility of the Welches' affidavits. The Welches allegedly heard the comment from their seats in the rear of the courtroom, yet neither the prosecutor, the defense counsel, the court reporter, nor the two jurors located and interviewed by the defense[3] heard anything. Furthermore, the fact that Wilson's counsel at the first trial did not attempt to alert the court when she was made aware of the alleged comment, or at any time prior to or following the next day's guilty verdict, suggests that she did not attach much weight to the Welches' accounts. Because the district court could determine from the record that the allegations were without credibility, we affirm the denial of an evidentiary hearing on extrinsic evidence.

## III. Agent Spinos' Report

■ Wilson argues that the district court erred in excluding evidence offered to rebut the testimony of government witnesses. The government relied on the telephone pager leased to Wilson's ex-employer and found in the secreted brown pouch with the metham-

---

**3.** Wilson maintains that an evidentiary hearing was required to question all the jurors about whether they heard the alleged comment and whether it affected the jury's decision. This opportunity was available (and perhaps strategically forgone) while the jury was still impaneled.

phetamine to connect Wilson to the drugs and to prove knowing possession. At his second trial, Wilson sought to rebut the testimony of Agents Teeple and Kocan by introducing, as an admission of a party opponent, a portion of DEA Agent Spinos' report indicating that the pager had been found on Wilson's belt. Agent Spinos had testified at the first trial that his report was in error, explaining that all evidence recovered from the search was collected and placed on a table before he arrived at the scene. The district court refused to admit the report at the second trial on the ground that the government would be denied the opportunity to cross-examine Agent Spinos. The district court's construction of the Federal Rules of Evidence is reviewed de novo. *United States v. Diaz*, 961 F.2d 1417, 1419 (9th Cir.1992).

Wilson argues that the statement qualified as an admission of a party opponent and thus was not hearsay. The government did not directly respond to this argument in its answering brief, but by a petition for rehearing questions whether such statements by government agents constitute admissions. We need not decide that issue nor even determine whether our prior decision in *United States v. Van Griffin*, 874 F.2d 634, 638 (9th Cir.1989) (holding that a Department of Transportation manual on sobriety testing was an admissible party admission, although its exclusion was harmless error) is applicable. Any error in excluding the report was harmless in that "it is more probable than not that the prejudice resulting from the error did not materially affect the verdict." *United States v. Lui*, 941 F.2d 844, 848 (9th Cir.1991).

■■■ Wilson did not claim that he lacked knowledge of the pouch or the methamphetamine. His entire defense, as presented in closing argument, consisted of the claim that the methamphetamine found in the pouch was for personal use rather than for distribution. The pager was circumstantial evidence of Wilson's drug dealing, regardless of where it was found. Moreover, had the report been admitted, the government undoubtedly would have minimized any possible impact by calling Agent Spinos or introducing his prior testimony. Finally, even had Wilson been

able to use the report to cast doubt on part of the government's evidence, the remaining evidence of his guilt was overwhelming.

## IV. *Armed Career Criminal Enhancement*

Wilson's sentence for his count 1 felon in possession conviction was enhanced pursuant to the Armed Career Criminal Act, 18 U.S.C. § 924(e), which provides for a sentence enhancement if the defendant has three previous convictions for violent felonies as defined in the statute. The indictment alleged three prior convictions as predicate offenses under § 924(e): a 1977 conviction for assault with a deadly weapon, a 1979 conviction for robbery, and a 1988 conviction for possession of a destructive device. At sentencing, the government conceded that the last of these offenses was a misdemeanor and thus did not qualify. The PSR, prepared after Wilson's first trial and filed on April 23, 1992, stated that Wilson qualified for armed career criminal classification based on the first two offenses listed in the indictment and a 1988 conviction for manufacture and possession for sale of methamphetamine. The criminal history section of the PSR listed several additional convictions, including a 1975 conviction for armed robbery. Wilson objected to using the 1988 methamphetamine conviction for the armed career criminal enhancement on the ground that it did not meet the definition of a serious drug offense under § 924(e)(2)(A). In the Second Addendum to the PSR, filed on September 8, 1992, the probation officer agreed that the methamphetamine conviction did not qualify as a predicate offense, but substituted the 1975 robbery conviction that had been listed in the criminal history section of the PSR. At sentencing on September 11, 1992, Wilson's counsel stated that he had not received the Second Addendum, and the court granted a 15–minute recess for counsel to review it.

■■■ The district court sentenced Wilson as an armed career criminal based on the three prior convictions listed in the Second Addendum. Thus the court imposed a 327–month sentence on count 1, instead of the otherwise applicable statutory maximum of 120 months, or 10 years. Wilson argues that the sentence violated his due process rights

because he received insufficient notice that the 1975 robbery conviction would be used for enhancement purposes. He claims that he was entitled to notice of the specific predicate offenses to be used and an opportunity to contest their applicability. Accordingly, Wilson requests a remand for the district court to determine whether he has three convictions that qualify as predicate offenses. The legality of a sentence is reviewed de novo. *United States v. Dunn,* 946 F.2d 615, 619 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991).

■ Due process requires that a defendant be reasonably informed of the government's intention to seek an enhanced sentence. *Oyler v. Boles,* 368 U.S. 448, 452, 82 S.Ct. 501, 503–04, 7 L.Ed.2d 446 (1962). Wilson unquestionably had notice from the indictment that the government would seek an enhancement under § 924(e). The issue is whether he was entitled to notice of the specific felonies on which the enhancement would depend and, if so, whether he received that notice.

■ We have held that "the three prior violent felonies required as a predicate for sentence enhancement [pursuant to § 924(e) ] need not be included in the indictment and proved at trial." *Dunn,* 946 F.2d at 619. Nor is the government required to list the predicate felonies for a § 924(e) enhancement in any formal notice pleading. *United States v. Alvarez,* 972 F.2d 1000, 1006 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1427, 122 L.Ed.2d 795 (1993). In *Alvarez,* however, the government's response to the defendant's sentencing objections informed the defendant "well before the sentencing hearing" of the prior convictions which would be relied upon in seeking the enhancement. *Id.* The defendant in *Dunn* "had ample notice of the government's intent to seek the [enhanced] penalty," but it is unclear whether the notice included the specific prior felonies on which the government would rely. *Dunn,* 946 F.2d at 620. Thus we have not clearly addressed whether a defendant must have notice of the specific prior convictions to be used for enhancement, and neither *Alvarez* nor *Dunn* supports the proposition that the government may substitute one conviction for another at the sentencing hearing without notice.

Several circuits have declined to address what notice, if any, is constitutionally required for a § 924(e) enhancement, finding notice that included the specific predicate convictions sufficient. *See United States v. Ruo,* 943 F.2d 1274, 1277 (11th Cir.1991) (without deciding whether notice was constitutionally required, notice was adequate where government listed prior convictions in indictment, although it listed many more convictions than the three required for enhancement, and provided further documentation of prior convictions in its discovery response); *United States v. Brewer,* 853 F.2d 1319, 1321 & n. 2 (6th Cir.) (without deciding whether notice was constitutionally required, holding that notice was sufficient when it preceded trial by more than a month and listed in detail the prior convictions relied upon), *cert. denied,* 488 U.S. 946, 109 S.Ct. 375, 102 L.Ed.2d 364 (1988), *and cert. denied,* 489 U.S. 1021, 109 S.Ct. 1142, 103 L.Ed.2d 202 (1989); *United States v. Hawkins,* 811 F.2d 210, 220 (3rd Cir.) (without deciding whether notice was constitutionally required, holding that adequate notice was given of government's intention to seek enhancement where such notice was filed two months before trial, stated government's intention to request armed career criminal enhancement, and listed in detail the prior convictions relied upon), *cert. denied,* 484 U.S. 833, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987).

Other circuits, however, have held that due process requires notice to a defendant that a particular conviction will be used for § 924(e) enhancement purposes. In *United States v. Pedigo,* 879 F.2d 1315, 1318–20 (6th Cir. 1989), the Sixth Circuit remanded an armed career criminal sentence enhancement because it was unclear whether two of the predicate offenses arose from a single criminal episode. The court rejected the argument that it could affirm based on an additional felony conviction that had not been argued at sentencing because it was unsure whether the defendant received adequate notice that the conviction would be used for enhancement purposes. *Id.* at 1319. Similarly, in *United States v. Craveiro,* 907 F.2d

260, 264 (1st Cir.), *cert. denied*, 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990), the First Circuit held that due process requires reasonable notice of and an opportunity to be heard concerning the prior convictions on which a § 924(e) enhancement depends. The court found constitutional requirements satisfied where the government notified the defendant of the Armed Career Criminal Act's applicability more than one month before the original sentencing date and the defendant had two hearings at which to contest the record as to his prior convictions. *Id. But see United States v. Gillies*, 851 F.2d 492, 496 (1st Cir.) (indictment alleging only that defendant was previously convicted of three or more violent felonies met constitutional notice requirements), *cert. denied*, 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988).

■■■ We agree with *Pedigo* and *Craveiro* that due process requires notice of and an opportunity to be heard regarding the specific prior convictions to be used for § 924(e) enhancement purposes. The notice must be sufficient to allow a defendant to investigate and object to the validity of the prior convictions. We find support for our holding in *United States v. Kearney*, 750 F.2d 787 (9th Cir.1984), in which we affirmed a sentence enhancement for a second drunk driving offense where the information to which the defendant pled guilty did not allege the prior conviction. We noted that "a defendant must ... receive notice and a reasonable opportunity to be heard regarding the prior conviction before a harsher sentence may be imposed on that basis." *Id.* at 790 (citing *Oyler*, 368 U.S. at 452, 82 S.Ct. at 503–04). We held that due process requirements were satisfied because the defendant had received notice that he was subject to greater penalties based on his prior DUI conviction and had been given an opportunity to challenge the validity of the prior conviction at the sentencing hearing. *Id.* at 790. It follows that Wilson was entitled to notice and an opportunity to be heard before he received nearly triple the otherwise applicable maximum sentence as an armed career criminal.

■■■ The issue thus becomes whether the notice to Wilson satisfied due process. Near-

ly five months before sentencing, Wilson received notice in the PSR of all prior felony convictions known to the government, including the 1975 robbery conviction. He also received brief notice on the day of the sentencing hearing that the government would rely on the 1975 conviction for the armed career criminal enhancement, and he had an opportunity to contest the validity of that conviction. Unlike *Pedigo*, the government has not attempted to support the defendant's sentence with a conviction that was not argued at the sentencing hearing. Nevertheless, Wilson contends that he was entitled to *more* notice, presumably to allow counsel to investigate the circumstances of the 1975 conviction and develop an argument against its use as a predicate for enhancement.

We need not decide whether 15 minutes was adequate notice under the circumstances, however, because any deficiency in notice would be harmless beyond a reasonable doubt. Wilson concedes that he knows of no defect in the applicability of the 1975 robbery conviction as a predicate for the enhancement. *Compare Alvarez*, 960 F.2d at 835–36, *and Dunn*, 946 F.2d at 620 (raising invalidity of prior conviction on appeal in addition to notice argument). Moreover, although Wilson objected to the use of the 1975 conviction at sentencing, he did not seek a continuance to allow him an opportunity to challenge the government's position. Because Wilson does not dispute that he committed the requisite number of predicate offenses, he qualifies as an armed career criminal. We affirm his sentencing as such.

## V. *Amount of Methamphetamine*

■■■ The district court sentenced Wilson based on his possession of approximately 10.5 grams of "pure" methamphetamine, or methamphetamine HCl, relying on a DEA chemist's report that Wilson possessed a total of 13.309 grams of a methamphetamine-based substance with purity levels of 78% and 79%. Wilson objected to the PSR's reliance on this figure. In support of his objection, Wilson submitted the declaration of a chemistry professor at San Diego State University regarding the possible margin of error in the DEA's measurement of purity level. The professor

explained that purity level usually is calculated by averaging the results of multiple tests, and that without a review of the DEA's worksheets and test data it was "impossible to state that Wilson had in excess of 10 grams of methamphetamine HCl with any degree of accuracy." Wilson argues on appeal that the district court erred in accepting the DEA's calculations and sentencing him based on possession of 10.5 grams.[4] A district court's findings of fact pertaining to sentencing are reviewed for clear error. *United States v. Upshaw,* 918 F.2d 789, 791 (9th Cir.1990), *cert. denied,* 499 U.S. 930, 111 S.Ct. 1335, 113 L.Ed.2d 266 (1991).

■ Wilson's argument is completely without merit. First, Wilson stipulated during both trials to the DEA chemist's testimony. Second, the government produced the DEA chemist's notes in response to the professor's declaration, and at sentencing defense counsel stated that the professor had concluded that the chemist's calculation was accurate. Thus there is no basis for holding the district court's finding clearly erroneous.

## VI. *Explanation of Reasons for Sentence*

■ The applicable guideline range for Wilson's convictions on counts 1 and 2 was 262–327 months. The district court imposed sentences of 327 months for each conviction, to run concurrently, and a consecutive 60–month sentence on count 3. Wilson contends that the district court failed to articulate its reasons for imposing a sentence at the top of the 65–month guideline range. Whether a district court adequately sets forth reasons for imposing a particular sentence within the applicable guideline range is reviewed de novo. *Upshaw,* 918 F.2d at 792.

18 U.S.C. § 3553(c) (1988) provides:

The court, at the time of sentencing, shall state in open court the reasons for its imposition of the particular sentence, and, if the sentence—

(1) ... range exceeds 24 months, the reason for imposing a sentence at a particular point within the range....

This statement must discuss the factors on which the particular sentence is based, including "individual considerations of background, character, and conduct, as well as the systemic goals of deterrence, rehabilitation, and consistency in sentencing." *Upshaw,* 918 F.2d at 792; *see* 18 U.S.C. § 3553(a) (1988) (listing factors to be considered in imposing sentence). We conclude that the district court failed to satisfy this requirement.

■ At the sentencing hearing, Wilson expressed his feeling that he was being sentenced for crimes he had already paid for in the past. After imposing sentence, the district court explained to Wilson that the Sentencing Guidelines and the Armed Career Criminal Act reflect Congress' judgment that some people in society cannot adjust and that "there comes a time in a person's criminal career that the person is to be exempted from society under all conditions." The government argues that this statement was sufficient to satisfy the requirements of § 3553(c). We disagree. The statement simply expresses the intent behind the Guidelines and the Armed Career Criminal Act. The district court made no statement pertaining to. Wilson's individual conduct, character, and criminal background. *Compare United States v. Gardner,* 988 F.2d 82, 85 (9th Cir.1993) (district court's statement that there were mitigating circumstances arising from defendant's diabetic condition was sufficient explanation for imposing sentence at low end of guideline range).

■ The government also argues that the district court's "written comments" attached to the judgment and commitment form satisfy § 3553(c). The document to which the government refers is a pro forma checklist summary of the sentencing proceeding. Under "Statement of Reasons for Imposing Sentence," the district court circled the only justification available for a high-end sentence, which states that "criminal history and other criminal conduct supports sentence in top range of guidelines." In *United States v. Johnson,* 953 F.2d 1167, 1173 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 226, 121

---

**4.** 21 U.S.C. § 841(b)(1) (1988) provides for dramatically different penalties for possession of more or less than 10 grams of "pure" methamphetamine.

L.Ed.2d 163 (1992), we held that a district court's written statement of its reasons for choosing a particular sentence satisfied § 3553(c). The statement in *Johnson*, however, discussed the particular defendant's characteristics and background, and served the purposes of the § 3553(c) statement.[5] A circle on a boilerplate sentencing form is not the equivalent of the individual consideration required by § 3553(c) and *Upshaw.*

We therefore vacate Wilson's sentences on counts 1 and 2 and remand for resentencing with a statement in open court that expressly considers the sentencing factors outlined in 18 U.S.C. § 3553(a).

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

---

**5.** The written statement in *Johnson* explained that the defendant had "'committed four prior robberies, each one within a short time of release on previous robberies. All this was driven by a heroin addiction the def[endan]t has not been able to master. Protection of the public requires a sentence at the statutory maximum.'" *Johnson,* 953 F.2d at 1173.