**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Oscar Acosta DELGADO,**
**Defendant–Appellant.**

No. 02–30363.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Filed Feb. 10, 2004.

John Lulejian, Assistant United States Attorney, Seattle, WA, for the appellee.

Beth M. Andrus, CJA, Seattle, WA, for the appellant.

Before BRUNETTI, T.G. NELSON, and GRABER, Circuit Judges.

BRUNETTI, Circuit Judge:

Oscar Acosta Delgado appeals his conviction of and sentence for conspiracy to possess methamphetamine with intent to distribute, 21 U.S.C. §§ 841 and 846 (2003) (Count 1), and possession of methamphetamine with intent to distribute, 21 U.S.C. § 841 and 18 U.S.C. § 2 (2003) (Count 2).

## FACTS AND PROCEEDINGS BELOW

On January 15, 2002, law enforcement officers served a search warrant on the residence of Jeffrey Shauers in an unincorporated area near Bremerton, Washington; there, they discovered large quantities of drugs and cash. Shauers was arrested and, immediately thereafter, agreed to cooperate with law enforcement. Shauers told agents that over the past eight

months he had sold approximately 25 to 30 pounds of methamphetamine with most of his supply over the prior six weeks coming from two men he knew as "Pedichinny" and "Jose." At trial, Shauers identified Delgado as "Jose," and Delgado's friend Juan Vasquez–Santiago conceded that he went by the nickname "Pedichinny."

Shauers stated that he met with Delgado and Vasquez–Santiago approximately six times over the course of the prior six weeks to conduct drug transactions, during which they all freely discussed their drug dealings. Shauers testified also that, when he asked Vasquez–Santiago for a reduced price, Vasquez–Santiago would ask Jose for permission. Moreover, Shauers testified that all three men had used drugs recreationally together on several occasions.

On January 16, under the supervision of law enforcement, Shauers placed several tape-recorded calls to Vasquez–Santiago inquiring about drug supplies. The transcript of one of the calls shows that Vasquez–Santiago had to "check with [his] friend, Jose" about quantity. Vasquez–Santiago ultimately agreed to bring two to four pounds of methamphetamine to Shauers' home that evening. One agent testified that Shauers had indicated that he expected Delgado to drive Vasquez–Santiago to the scheduled drug deal in a blue Chevy Blazer. Prior to Vasquez–Santiago's arrival at Shauers' home that evening, law enforcement agents installed video surveillance equipment in Shauers' garage for the purpose of recording the drug transaction.

When the blue Blazer approached Shauers' residence, the driver initially passed Shauers' driveway, made a U-turn, and then pulled in. Delgado got out of the vehicle and stood for several minutes in front of it while Vasquez–Santiago went into Shauers' garage. According to the video recording, while Delgado was standing out front, Vasquez–Santiago and Shauers chatted in the garage.

Delgado was then observed approaching the garage for a moment and then returning to the vehicle, where he turned on the interior dome light and appeared to be working on something in the back. Delgado then brought a Wal–Mart bag, which was wrapped tightly in electrical tape, into the garage; moments later, Delgado walked out to the car once more and was almost immediately thereafter arrested.

In the Blazer, agents found a vehicle registration in Delgado's name and, in the back of the vehicle, they found two rolls of electrical tape. Agents also discovered that there was a panel removed from the car's interior disclosing an empty compartment; several screws and a matching screwdriver were also found near the compartment. Agents testified that the compartment smelled strongly of chemicals.

Vasquez–Santiago testified at trial that, although he and Delgado were friends, Vasquez–Santiago had run into Delgado completely coincidentally in a store on January 16. Vasquez–Santiago stated that his car had broken down and that when he ran into Delgado, he asked Delgado if he could borrow Delgado's car. Delgado agreed, and Vasquez–Santiago took the car alone out to a logging road to pick up drugs from a third party. Vasquez–Santiago hid the drugs in the Blazer's hidden compartment using a screwdriver Vasquez–Santiago found in the car. Vasquez–Santiago then returned to town, met Delgado at a store, and asked Delgado if he would drive Vasquez–Santiago to a friend's house in Olympia. Again, Delgado agreed, and they drove together to Shauers' residence. Vasquez–Santiago maintained throughout his testimony that Delgado had never participated in any drug transactions with Vasquez–Santiago or Shauers and that

Delgado knew nothing of the drug transaction on the night in question.

Delgado confirmed Vasquez–Santiago's rendition of the events, stating that he had no plan to meet Vasquez–Santiago that night. Delgado also testified that he did not know why Vasquez–Santiago needed a ride or where they were going. He stated further that he did not know what the bag contained; he testified that he merely grabbed the bag by the handles and handed it to Vasquez–Santiago upon Vasquez–Santiago's request. Delgado maintained throughout trial that he had never participated in drug transactions in the past and had not met Shauers until the night of the arrest. Delgado conceded, however, that at some point at Shauers' residence, it occurred to him that Vasquez–Santiago was doing something wrong.

Although Vasquez–Santiago pled guilty, Delgado opted to stand trial for possession of methamphetamine with intent to distribute and conspiracy to possess methamphetamine with intent to distribute. After two days of testimony, a jury returned a guilty verdict on each count. This timely appeal followed.

## DISCUSSION

### 1. *Jury Instructions*

Delgado challenges the district court's Instruction Number 9, which defined when an act is done "knowingly"; among other aspects, the instruction specifically relieved the Government of its burden to prove that the defendant "knew that his acts or omissions were unlawful." Delgado contends that because (1) the crime of possession requires that the defendant knowingly possess a controlled substance, and (2) the crime of conspiracy requires that the defendant agree to commit an unlawful act, the court erred in relieving the Government of its burden to prove that Delgado knew that his acts were unlawful.

■ Because Delgado did not object to the jury instructions, we review their adequacy for plain error. *United States v. Matsumaru*, 244 F.3d 1092, 1102 (9th Cir. 2001). Plain error requires an " '(1) error, (2) that is plain, and (3) that affects substantial rights.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). If these three conditions are met, we may exercise our discretion to notice the error but only if it "(4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citing *Johnson*, 520 U.S. at 467, 117 S.Ct. 1544).

■ Delgado was tried for violations of 21 U.S.C. §§ 841 and 846 relating to the possession of methamphetamine with intent to distribute and conspiracy to possess methamphetamine with intent to distribute, respectively. Section 841(a)(1) provides: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." To properly convict for this crime, therefore, the Government must prove beyond a reasonable doubt that the defendant (1) knowingly, (2) possessed an illegal drug, (3) with the intent to distribute it. *United States v. Ocampo*, 937 F.2d 485, 488 (9th Cir.1991). Possession may be either actual or constructive, with the latter concept encompassing a defendant's power to exercise dominion and control over the narcotics as well as his or her participation in a "joint venture" to possess a controlled substance. *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir. 1986).

■ A defendant also may be guilty of this provision if he or she aids or abets another in its commission; a conviction of

aiding and abetting requires the Government to prove four elements:

(1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense.

*United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir.1988). Indeed, "[t]o aid and abet another to commit a crime, the government must show not only that the defendant participated in the criminal venture, but that he intentionally assisted the venture's illegal purpose." *Disla*, 805 F.2d at 1352 (citation and internal quotation marks omitted).

■ Section 846, in turn, provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846. A conspiracy is " 'an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense.' " *Disla*, 805 F.2d at 1348 (quoting *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir.1984)). Moreover, once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy. *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir.1987).

■ At the close of Delgado's two-day trial, the district court gave the jury a series of instructions, including several Ninth Circuit Model Jury Instructions.

Delgado challenges only the district court's Instruction Number 9, which the court lifted verbatim from Ninth Circuit Model Instruction 5.6, entitled "Knowingly—Defined." The court's instruction read as follows:

An act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident. *The government is not required to prove that the defendant knew that his acts or omissions were unlawful.* You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

(Emphasis added.) The commentary to Model Instruction 5.6 specifically notes that the emphasized sentence "should not be given where an element of the offense requires the government to prove that the defendant knew that what the defendant did was unlawful." Ninth Cir. Model Jury Instr. 5.6 cmt. (citing *United States v. Santillan*, 243 F.3d 1125, 1129 (9th Cir. 2001) (violation of Lacey Act requires that the defendant know that importing wildlife is unlawful); *United States v. Turman*, 122 F.3d 1167, 1169 (9th Cir.1997) (money laundering statute requires that the defendant know that transactions involved criminally derived property but not that money laundering itself is illegal)). The inclusion of this sentence forms the basis of Delgado's contention of error.

The court also instructed the jury as to the other elements of the substantive offenses. Instruction Numbers 10 through 13 laid out the elements of the conspiracy charge. The court stated that the Government had to prove beyond a reasonable doubt that there was an agreement between two or more persons to commit Count 2 (possession of methamphetamine with intent to distribute), and that the

defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it. Also within the lengthy conspiracy instructions, the court noted, "The crime of conspiracy is the agreement to do something unlawful."

Instruction Number 14 provided the law for possession of a controlled substance with intent to distribute. The court stated that, for the defendant to be found guilty of this charge, the Government must prove that the defendant knowingly possessed methamphetamine and that the defendant possessed it with the intent to deliver it to another person. Moreover, the court noted: "It does not matter whether the defendant knew that the substance was methamphetamine. It is sufficient that the defendant knew that it was some kind of a prohibited drug."

The court also instructed the jury that the defendant could be guilty of possession if the defendant aided and abetted in its commission. The court noted that to be guilty of this offense, the Government had to prove that (1) possession with intent to distribute was committed by someone; (2) the defendant knowingly and intentionally aided, counseled, commanded, induced, or procured that person to commit possession with intent to distribute methamphetamine; and (3) the defendant acted before the crime was completed.

■ Delgado asserts that both of the charged crimes include an element that he knew that his actions were unlawful and, thus, Instruction Number 9 improperly relieved the Government of its burden to prove this element. The Due Process Clause requires the Government to prove all the elements of a crime beyond a reasonable doubt. *United States v. Orduno–Aguilera*, 183 F.3d 1138, 1140 (9th Cir. 1999). A jury instruction cannot relieve the Government of this burden. *Patterson v. Gomez*, 223 F.3d 959, 962 (9th Cir.2000).

First, Delgado argues that to convict for possession of a controlled substance with the intent to distribute, the Government must prove that Delgado knew he possessed a controlled substance; this requirement, he contends, directly conflicts with the emphasized text in Instruction Number 9, which excuses the Government from proving that he knew that his activity was unlawful. This court addressed this purported conflict in *United States v. Cain*, 130 F.3d 381, 384 (9th Cir.1997). In *Cain*, the district court instructed the jury that the intent-to-distribute offense did not require that Cain actually knew he was distributing cocaine, but only that he knew he was distributing an illegal substance. *Id.* The court also gave the typical ignorance-of-the-law instruction: "The government is not required to prove that the defendant knew that his acts were unlawful." *Id.* Explaining the failure of Cain's argument that these two instructions conflicted, the court said:

> Cain did not have to know that possession of a controlled substance was illegal. He only had to know that the substances he possessed were controlled substances. Therefore, when the court instructed that the government did not have to prove Cain knew his acts were illegal, the court did not say that Cain needed no knowledge of whether he possessed controlled substances.

*Id.* The same holds true here: Although the Government had to prove that Delgado knew he possessed some prohibited substance, he did not necessarily need to know that such possession constituted a violation of the law. *See id.; see also United States v. Barbosa*, 271 F.3d 438, 457–58 (3d Cir.2001) (noting that any other rule "would be tantamount to compelling the Government to disprove an ignorance of the law defense"). Therefore, under *Cain*, there was no error in giving both Instruction Numbers 9 and 14.

■ Delgado next argues that the Government relied on the secondary theory of aiding and abetting to secure his conviction, and that such charge requires the defendant's specific knowledge that the act in question is illegal; indeed, case law establishes that to aid and abet another to commit a crime, "the government must show not only that the defendant participated in the criminal venture, but that he intentionally assisted the venture's illegal purpose." *Disla*, 805 F.2d at 1352 (internal quotation marks omitted).

In the case of aiding and abetting, however, like possession, *Cain's* thing/act distinction also applies. Here, although Delgado needed to know that he was assisting Vasquez–Santiago to commit the crime of possession with intent to distribute methamphetamine, he did not need to know that such act of assisting constituted a crime.

■ Finally, Delgado argues that the combination of Instruction Numbers 9 and 10 constituted reversible error, as the conspiracy charge required the Government to prove that Delgado "became a member of the conspiracy *knowing* of at least one of its objects and intending to help accomplish it." (Emphasis added.) Here, again, applying the principle in *Cain*, Delgado needed to know that at least one of the agreement's objects was to carry out illegal activity, but he did not need to know that the very making of such an agreement constituted unlawful activity. Because the court's instructions were without error, there was no plain error.

### 2. *Sufficiency of Evidence*

■ Delgado next claims that the Government presented insufficient evidence to convict on both Counts 1 and 2. As here, when a defendant does not preserve a claim of sufficiency of the evidence by failing to make a motion for acquittal at the close of the evidence, the review is deferential, requiring reversal only upon plain error or to prevent a manifest injustice. *United States v. Alvarez–Valenzuela*, 231 F.3d 1198, 1200–01 (9th Cir.2000). A challenge to the sufficiency of the evidence requires this court to determine if " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Carranza*, 289 F.3d 634, 641–42 (9th Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)), *cert. denied*, 537 U.S. 1037, 123 S.Ct. 572, 154 L.Ed.2d 458 (2002). Moreover, when there is an innocent explanation for a defendant's conduct as well as one that suggests that the defendant was engaged in wrongdoing, the Government must produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the latter explanation is the correct one. *United States v. Vasquez–Chan*, 978 F.2d 546, 549 (9th Cir.1992). Finally, the credibility of witnesses is a question for the jury, unreviewable on appeal. *See United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir.1999).

Although both Vasquez–Santiago and Delgado testified that Delgado played no substantive role in the January 16 transaction nor any other previous drug transactions, Shauers testified otherwise. Shauers said that he referred to Vasquez–Santiago as "Pedichinny" and Delgado as "Jose," and Shauers positively identified Delgado as "Jose" at trial. When asked roughly how many times he had transacted with Vasquez–Santiago and Delgado and what kind of price and poundage were involved, Shauers testified that he had "seen Pedichinny and Jose probably four or five, six times," that he mainly paid "[$]5,500 a pound" and bought "every time, at least two pounds." Shauers also testified that he, Vasquez–Santiago, and Delga-

do had discussed drugs together on several occasions and that Delgado was clearly involved in all the discussions; indeed, Shauers indicated that Delgado played an active role in the negotiations: "[W]henever I asked Pedichinny for, say, a break or would want to see a particular thing, he would always have to reflect and ask Jose." Moreover, Shauers described an occasion when a drug transaction among the three men took place "on a logging road when Jose drove." Shauers stated that after Delgado had driven his blue Blazer about a quarter mile down the logging road, they stopped, Delgado turned to Vasquez–Santiago, said something to the effect of, "You know where to go," and then Vasquez–Santiago got out of the car and retrieved drugs. Shauers also stated that he, Vasquez–Santiago, and Delgado had all used drugs together. Despite the obvious tension between the men's testimony, questions of witness credibility fall squarely and exclusively within the jury's purview. We must defer to the jury's credibility determinations and, given the convictions, we may safely infer that the jury believed Shauers' testimony over Delgado's and Vasquez–Santiago's.

Delgado points this court to several cases in which insufficient evidence supported the defendants' convictions on identical charges, *see* App. Open. Br. at 37–42 (citing *United States v. Bautista–Avila,* 6 F.3d 1360 (9th Cir.1993); *United States v. Vasquez–Chan,* 978 F.2d 546 (9th Cir. 1992); *United States v. Penagos,* 823 F.2d 346 (9th Cir.1987); and *United States v. Lopez,* 625 F.2d 889 (9th Cir.1980)); yet in all of them, the evidence was far weaker than that presented against Delgado.

For example, in *Bautista–Avila,* the closest case of the four cited, the Government presented significant circumstantial evidence implicating the defendants in the drug conspiracy, such as proximity to the large stash of cocaine, an agreement "to hold" $5,000 for one of the conspirators, and the defendants' entry into the United States just one minute later than the vehicle transporting the narcotics. However, no direct evidence showed that the two defendants had participated in previous drug transactions with the other conspirators or in the transaction that was the subject of the trial. *Bautista–Avila,* 6 F.3d at 1362–63. All the evidence was circumstantial. The court concluded, therefore, that the Government had failed to prove beyond a reasonable doubt that the defendants' actions were the result of wrongdoing. *Id.* at 1363 (citing *Vasquez–Chan,* 978 F.2d at 549).

Similarly, in *Lopez,* although the defendant was present in what appeared to be a look-out or "security" vehicle parked across the street from a scheduled drug sale to an undercover informant, there was no direct evidence that the defendant had participated in any drug transactions in the past nor that he willingly became a participant in the drug transaction in question. *Lopez,* 625 F.2d at 896–97. Here, although Delgado asserted that he was in the same position as Lopez—the innocent and ignorant tagalong—the Government presented sufficient direct evidence against Delgado to refute this assertion, albeit all from Shauers' testimony.

The evidence presented at trial was sufficient for a rational jury to conclude that Delgado and Vasquez–Santiago had agreed to carry out a drug transaction on January 16 and, moreover, that Delgado had the authority to exert dominion and control over the drugs on the night in question. As mentioned above, once a conspiracy has been established, the Government need only prove a defendant's slight connection to it. *See Penagos,* 823 F.2d at 348. Here, again, Shauers indicated that Delgado and Vasquez–Santiago had supplied drugs to Shauers on several previous occa-

sions and that Delgado played an active role in at least some of those transactions. This evidence establishes the existence of conspiracy—an agreement between Delgado and Vasquez–Santiago to conduct illegal drug deals. The existence of this conspiracy belies Delgado's claim that he exercised no dominion or control over the drugs during the transaction of January 16.

The jury could have rationally concluded that Delgado exercised dominion or control over the drugs. Shauers testified that Delgado had so acted in the past and, thus, the jury could properly conclude that he had the requisite authority to do so on January 16. *See Disla,* 805 F.2d at 1350.

### 3. *Use of Transcripts*

■ At trial, the Government presented audio tape recordings of several telephone calls between Shauers and Vasquez–Santiago prior to the January drug transaction, as well as a video tape recording of the transaction itself. The Government had also prepared transcripts of the contents of the recordings. A transcript of one of the phone conversations indicated that Vasquez–Santiago referred to "Jose" during the call, stating that he would need to "check with [his] friend, Jose" to see if they could provide the quantity of drugs Shauers sought. At trial, Vasquez–Santiago testified that he never referred to "Jose" in the recorded conversation. The court allowed the jury to look at the transcripts while the tape recordings played, but specifically instructed the jury that the transcripts were provided only to help the jurors understand the recordings and that the recordings themselves constituted the evidence. After playing the recordings, the jurors returned the transcripts to the court clerk.

Delgado contends that the district court erred in admitting the transcripts into evidence and in allowing the jury to have access to the transcripts during deliberations; however, it appears that the district court did not admit the transcripts into evidence nor allow the jury access to the transcripts during deliberations. As mentioned above, the court specifically instructed the jury that the recordings only—and not the transcripts—constituted evidence. Also, after the jury had been sent to the jury room to deliberate, the court said to the parties: "In anticipation that the jury is going to want to hear the tapes again, those transcripts, five minutes notice." Moreover, during deliberations, the jury sent the judge a note saying, "We want a video and audio transcripts or players," to which the judge replied, "[I]f you wish to hear the ... audios you heard before, with the transcripts that you *had,* they must be played here again in the courtroom, not in the jury room, in the presence of the defendant and both counsel and court." (Emphasis added.) In sum, the record does not indicate that the court admitted the transcripts into evidence or allowed the jury to have access to the transcripts during deliberations.

■ We review, however, the use of transcripts as an aid in listening to tape recordings for an abuse of discretion. *United States v. Armijo,* 5 F.3d 1229, 1234 (9th Cir.1993). In so doing, we review the steps taken to ensure the accuracy of the transcripts: whether the court reviewed the transcript for accuracy; whether defense counsel was allowed to highlight alleged inaccuracies and to introduce alternative versions; whether the jury was instructed that the tape, rather than the transcript, was evidence; and whether the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations. *Id.; see also United States v. Booker,* 952 F.2d 247, 249–50 (9th Cir. 1991) (per curiam) (considering same cri-

teria plus whether the federal agent who prepared the transcript testified to its accuracy).

As in *Armijo*, although there is no indication that the court reviewed the transcripts for accuracy, Delgado was allowed to highlight alleged inaccuracies through Vasquez–Santiago's testimony; the jury was instructed that the tape, rather than the transcript, was evidence; and the jury was allowed to compare the transcript to the tape and hear counsel's arguments as to the meaning of the conversations. Moreover, the federal agent who prepared the transcripts testified to their accuracy. Thus, the court did not abuse its discretion in allowing the transcripts to be admitted for the limited purpose of a listening aid.

**4.** *Sentencing Requirements Under 18 U.S.C. § 3553*

■ Delgado contends that the district court erred in sentencing Delgado at the high end of the range without providing a statement of reasons as required by 18 U.S.C. § 3553(c). The Government points to the court's "Statement of Reasons," dated October 28, 2002, as satisfying § 3553's mandate; however, this court struck that document by an order of this court filed September 25, 2003; thus, we will not consider the document. The court stated no other reasons on the record for imposing the top-of-the-range, 188–month sentence on Delgado.

■ Title 18, United States Code, section 3553(c) (2003) provides that the sentencing court, at the time of sentencing, must state in open court the reasons for its imposition of the particular sentence and, if the sentence range exceeds 24 months, the reason for imposing a sentence at a particular point within the range. The court must discuss the factors on which the particular sentence is based, including " 'individual considerations of background, character, and conduct, as well as the sys-

temic goals of deterrence, rehabilitation, and consistency in sentencing.' " *United States v. Wilson,* 7 F.3d 828, 839 (9th Cir.1993) (quoting *United States v. Upshaw,* 918 F.2d 789, 792 (9th Cir.1990); citing 18 U.S.C. § 3553(a) (listing factors to be considered in imposing sentence)). We review *de novo* whether the district court complied with this requirement. *Id.*

District courts must provide defendant-specific reasons for imposing a certain sentence to comply with § 3553. In *Wilson,* the court vacated the defendant's sentence because "[t]he district court made no statement pertaining to Wilson's individual conduct, character, and criminal background." *Id.* (comparing *United States v. Gardner,* 988 F.2d 82, 85 (9th Cir.1993) (per curiam) (district court's statement that there were mitigating circumstances arising from defendant's diabetic condition was sufficient explanation for imposing sentence at low end of guideline range)).

The *Wilson* court also rejected the Government's argument that "a pro forma checklist summary of the sentencing proceeding" satisfied § 3553; under the heading, "Statement of Reasons for Imposing Sentence," the district court had circled the only justification available for a high-end sentence, which stated that "criminal history and other criminal conduct supports sentence in top range of guidelines." *Id.* The court explained: "A circle on a boilerplate sentencing form is not the equivalent of the individual consideration required by § 3553(c) and *Upshaw.*" *Id.* at 840.

The district court here did not explain the reasons behind the sentence it imposed. Thus, we vacate Delgado's sentence and remand for resentencing with instructions to address the sentencing factors outlined in 18 U.S.C. § 3553(a) explicitly. *See id.; see also United States v. Matthews,* 278 F.3d 880, 889 (9th Cir.),

*cert. denied,* 535 U.S. 1120, 122 S.Ct. 2345, 153 L.Ed.2d 173 (2002).

## CONCLUSION

Because the court did not commit reversible error during trial and the verdict was supported by substantial evidence, Delgado's conviction is AFFIRMED. The court, however, erred in not stating in open court the reasons underlying the sentence imposed and, therefore, Delgado's sentence is VACATED and the case is REMANDED for resentencing.