**UNITED STATES of America, Plaintiff,**

v.

**Javier GUITTEREZ, Defendant.**

**No. CR 96–40075 SBA.**

United States District Court,
N.D. California.

Jan. 23, 1998.

Kimberly M. Briggs, U.S. Atty.'s Office, Oakland, CA, for Plaintiff.

Harry C. Singer, W.L. Osterhoudt Law Offices, San Francisco, CA, for Defendant.

### ORDER GRANTING IN PART AND DE-NYING IN PART DEFENDANT'S MOTION TO SUPPRESS

ARMSTRONG, District Judge.

Defendant Javier Guitterez, an illegal alien residing in this country, is alleged to be a narcotics supplier involved in a large-scale drug distribution operation. Defendant is charged with having committed drug trafficking crimes involving cocaine, methamphetamine, and marijuana, in violation of 21 U.S.C. § 841(a)(1).

The parties are presently before the Court on defendant's Motion to Suppress Evidence. Specifically, he seeks to suppress evidence seized from a residence located at 1091 Mitchell Way in El Sobrante, California, pursuant to a search warrant issued by Judge Lillian B. Sing of the San Francisco County Municipal Court.[1] Judge Sing issued the warrant upon the application and affidavit of Special Agent James Rodriguez of the State of California Department of Justice. Defendant also seeks to suppress all statements and observations made during an allegedly illegal traffic stop made on April 17, 1996. Having read and considered all memoranda filed in connection with this matter, and having heard oral argument on the issues involved, the Court GRANTS defendant's motion, in part, and DENIES the motion, in part.[2]

### BACKGROUND

#### A. *Factual Summary*

##### 1. *Defendant's Residence*

Defendant entered the United States illegally from Mexico in 1985. He alleges that from 1985 to 1987 he lived in Southern California, and in Northern California since 1987. In 1993, defendant married Delia Ruvalcaba, a resident alien, with whom he had a child in September 1993. Although there is no evidence relative to whether or where the de-

---

1. Judge Sing issued search warrants for six locations, five of which are not challenged by this motion.

2. This Order supersedes the Order Denying Defendant's Motion to Suppress, filed October 16, 1997.

fendant maintained a residence within this country at the time of the search, Department of Motor Vehicle records revealed that as of August 20, 1993, defendant's address was 1128 D Street, Hayward, California. (Aff. at 13–14.) In addition, defendant's wife disclosed that she resided at 3997 Via Estrella, Martinez, California. (*Id.* at 12–14.)

Defendant possesses a California driver's license and has paid sales and use taxes on commodities such as food, clothing, gasoline and other personal items. However, there is no indication that he has ever been lawfully employed in this country, generated any legal income upon which he has paid federal or state income taxes, or otherwise contributed to the national treasury.

### 2. *Summary of Events*

Prior to his arrest, defendant was surveilled by various law enforcement officers. The search warrant affidavit prepared by Agent Rodriguez sets forth in some detail the events which took place prior to the challenged searches.

On April 17, 1996, Agent Rodriguez, acting undercover, and with the assistance of a cooperating informant, arranged for the purchase of one kilogram of cocaine from an individual named Raul Torres.[3] (*Id.* at 6–7.) The controlled purchase was to take place at the Birrieria Jalisco Restaurant in San Francisco that same day. (*Id.*)

Based on surveillance conducted before, during, and after the purchase, Agent Rodriguez, the affiant, represented to Judge Sing that he "believe[d]" that the defendant delivered one kilogram of cocaine to the Birrieria Jalisco Restaurant prior to the controlled purchase. (*Id.* at 8, 9, 11, 11A.) The affiant further reported that, prior to entering the storage room in which the controlled purchase took place, he observed the defendant seated at a table in the restaurant with Torres, and that Guitterez remained seated at the table when he and the informant exited the storage room and the restaurant. (*Id.* at 9, 11, 11A.) The affiant indicated that Guitterez remained in the restaurant for approximately nine minutes, during which time the

affiant "believe[d]" that Torres delivered to Guitterez the money which he received from Agent Rodriguez during the controlled purchase and that Guitterez then counted the currency. (*Id.* at 11A.)

At about 4:27 p.m., surveilling officers observed Guitterez leave the restaurant. (*Id.* at 11A, 12.) The defendant, accompanied by a child and a Latina woman (later identified as Delia Ruvalcaba), entered a brown Mercury Cougar. (*Id.*) Surveillance personnel observed the vehicle travel eastbound on the San Francisco–Oakland Bay Bridge and exit in the city of Emeryville. (*Id.*) In Emeryville, the vehicle pulled into a Shell gasoline station. (*Id.*)

At approximately 5:00 p.m., California Highway Patrol ("CHP") Officer Troy Verduzco was contacted by Special Agent Don Van Dorn, one of the surveillance officers, for assistance in making a traffic stop. (Narrative/Supplemental Report, Attachment 1 to Gov't Supp. Mem.) Agent Van Dorn informed Officer Verduzco that an occupant of the Cougar was not wearing a safety belt. (*Id.*) Officers Verduzco and Scott Lebell then proceeded towards the Emeryville Shell station. At around 5:28 p.m., a few minutes after the Cougar departed the gas station, the officers effected an automobile stop at University Avenue and Frontage Road, based on an alleged traffic violation. (Aff. at 12.)

Officer Verduzco approached the Cougar from the rear and observed a female adult (Ruvalcaba) seated in the right rear seat next to a child. (Narrative/Supplemental Report.) He observed that neither the child nor the female was wearing a seatbelt. (*Id.*) Officer Verduzco also observed empty ziplock baggies on the right front seat. (*Id.*) After advising the defendant of the reason for the stop, Officer Verduzco requested his driver's license and registration. (*Id.*) Defendant was unable to produce either document. (*Id.*) The officer then requested the defendant to exit the vehicle, whereupon he conducted a pat down search for safety reasons. (*Id.*) During the pat search, Officer Verduzco observed a "large wad" of United States currency in defendant's right rear pants

---

**3.** The informant had met with Torres in the past and had, at the direction of agents from the Drug

Enforcement Agency ("DEA"), arranged for and completed one prior drug purchase from Torres.

pocket and felt "large wads" of United States currency in the two front pockets. (*Id.*) [4]

The defendant verbally identified himself to the officers as Javier Guitterez, indicated that his date of birth was May 10, 1970, and gave "a residence address of El Sobrante...." (Aff. at 12–13.) Ruvalcaba stated that she lived at 3997 Via Estrella, Martinez, California. (*Id.* at 13.) The officers did not cite the defendant and he was allowed to leave. (*Id.;* Narrative/Supplemental Report.)

Guitterez, Ruvalcaba, and the child then proceeded to 1640–17th Street #3 in San Pablo where they entered the apartment. (Aff. at 13.) Within a short time, all three individuals exited the apartment and reentered the Cougar. (*Id.*)

At approximately 6:26 p.m., surveillance personnel observed the Cougar arrive at 1091 Mitchell Way in El Sobrante. (*Id.*) The garage at 1091 Mitchell Way opened and the Cougar pulled into the garage. There is conflicting evidence both within and without the affidavit as to how the garage door was opened. Agent Rodriguez represented in his search warrant affidavit that "[Special Agent] Burns observed GUITTEREZ operate a remote control garage door opener" and enter the garage. (*Id.*) Later in the affidavit, he represented that "Javier GUITTEREZ and Delia RUVALCABA were observed opening the garage door with a remote garage door opener...." (*Id.* at 23 (emphasis added).) However, according to Agent Burns, he "saw the vehicle go into the garage by use of what appeared to be a garage door opener and then saw the garage door close...." (Singer Decl. ¶ 18.)

A 1988 Hyundai automobile was observed parked in the driveway at 1091 Mitchell Way. (Aff. at 13.) A subsequent investigation revealed that the registered owner of the 1988 Hyundai was Gerardo Lizade, 2208 Emeric Avenue, San Pablo. (*Id.*) The brown Mercury Cougar driven by the defendant was registered to Miguel Angel Martinez, 1404 Emeric Avenue, San Pablo, California. (*Id.* at 17.)

On April 18, 1996, the affiant queried the California Law Enforcement Telecommunications System ("CLETS") and the Department of Motor Vehicles ("DMV") database. (*Id.* at 13.) The affiant ascertained defendant's California Driver's License number was B4522775 and confirmed his date of birth as May 10, 1970. (*Id.* at 14.) In addition, the affiant's query revealed that defendant's address as of August 10, 1993 was 1128 D Street, Hayward, California. (*Id.*) The affiant's query of the DMV database also confirmed that Ruvalcaba's address was 3997 Via Estrella Street, Martinez, California. (*Id.*)

On April 30, 1996, the affiant applied for and was granted a search warrant for PG & E Utility Subscriber Information. (*Id.* at 14.) The PG & E records obtained pursuant to that warrant listed Julio Ruvalcaba as the subscriber for 1640–17th Street #3, the address to which the defendant, Delia Ruvalcaba, and the child travelled immediately after being detained by the CHP officers. (*Id.* at 15.)

The PG&E records also revealed that Victor and Marialena Lozaya were the subscribers and payors at 1091 Mitchell Way. (*Id.* at 15, 17.) The credit for the PG&E account was established by Raquel Ponce. (*Id.* at 17.) The affidavit reports no information concerning any ownership or other possessory interests in 1091 Mitchell Way and there was no further surveillance or investigation of the residence.

### 3. *The Search Warrant*

On or about May 2, 1996, Agent Rodriguez submitted the aforementioned affidavit to Judge Sing requesting search warrants for six locations, including the Birrieria Jalisco Restaurant, the apartment at 1640–17th Street #3 in San Pablo, and the residence at 1091 Mitchell Way in El Sobrante. (*Id.* at 23–25.) According to defendant, Agent Rod-

---

**4.** In the search warrant affidavit, affiant Rodriguez represented to Judge Sing his belief that the money "felt" by Officer Verduzco was the large quantity of state recorded funds provided to Torres in exchange for the cocaine at the restaurant.

(Aff. at 13.) The affiant also opined that the baggies observed in the Cougar were the same ones in which he observed Torres place the state recorded funds during the controlled sale. (*Id.*)

riguez, at Judge Sing's request, augmented the affidavit with handwritten statements. (*Id.* at 11A, 13.) Judge Sing then issued search warrants for all six locations.

On May 9, 1996, law enforcement officers, led by Agent Rodriguez, executed the warrant at 1091 Mitchell Way. The officers seized $8,152 in cash, documents in the name of the defendant and his wife, and various quantities of cocaine, methamphetamine, and marijuana. Defendant later admitted to Agent Rodriguez his responsibility for the contraband.

### B. *Procedural History*

On June 13, 1996, the Government filed a four count Indictment against the defendant. The Indictment charges the defendant with: (1) possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1); (2) possession of methamphetamine with intent to distribute, *id.;* and (3) possession of marijuana with intent to distribute, *id.* In addition to these charges, the Indictment seeks the forfeiture of property which was involved in or traceable to the above conduct. *See* 21 U.S.C. § 853.

Defendant Guitterez has filed a Motion to Suppress, pursuant to the Fourth Amendment. He contends that the evidence seized at 1091 Mitchell Way on May 9, 1996 and statements and admissions which he made on and after that date must be suppressed because (1) the affidavit is facially insufficient to support the search warrant, and (2) the affidavit contains false and/or misleading statements and omissions under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). He further argues that all statements and observations made in the course of the April 17, 1996 traffic stop in Emeryville must be suppressed on the grounds that CHP officers who effected the vehicle stop were without authority to do so.

In opposing defendant's motion, the Government first argues that because Guitterez is an illegal alien, he lacks standing to seek the suppression of evidence under the Fourth Amendment. Alternatively, the government argues that: (1) the affidavit contains sufficient information to support the magistrate's finding of probable cause; (2) the agents executing the search warrant had a good faith belief in the validity of the search warrant under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); and (3) the CHP officers had sufficient probable cause and reasonable suspicion to conduct a valid automobile stop.

On October 16, 1997, the Court denied defendant's motion to suppress on the basis that he failed to demonstrate that he had standing under the Fourth Amendment. In reaching that conclusion, the Court relied on the Supreme Court's decision in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) and the Ninth Circuit's opinion in *United States v. Barona,* 56 F.3d 1087, 1093 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 813, 133 L.Ed.2d 759 and ——U.S.——, 116 S.Ct. 814, 133 L.Ed.2d 759 (1996). The Court construed these cases as standing for the proposition that an illegal alien may seek the shelter of the Fourth Amendment only to the extent that he has developed substantial connections with this country by voluntarily assuming the societal obligations imposed upon "the people of the United States."

Reviewing the evidence presented by the parties, the Court concluded that the defendant had not met this standard, as he had "failed to establish that he has assumed the complete range of obligations that are imposed on citizens, that he has voluntarily undertaken sufficient obligations of citizenship, or has developed substantial connections with the United States to be considered one of 'the people of the United States'." (Order at 16.) As such, the Court concluded that the defendant lacked standing to raise a Fourth Amendment challenge to the evidence at issue, and on that basis, denied the motion to suppress.[5]

Given the magnitude, breadth, and gravity of the issues presented and the lack of clear precedential authority, the Court has contin-

---

**5.** On November 19, 1997, the Court issued an Order staying the Order Denying Defendant's Motion to Suppress.

ued to contemplate the arguments and authorities presented by the parties. In addition, the Court has researched, reviewed and considered additional authorities which were not previously presented by the parties. After considerable further deliberation, the Court *sua sponte* finds that reconsideration of the prior Order denying defendant's motion to suppress is warranted.

## DISCUSSION

### A. STANDING UNDER THE FOURTH AMENDMENT

The Fourth Amendment to the United States Constitution enjoins unreasonable searches and seizures. *See Whren v. United States,* 517 U.S. 806, ——, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). The Fourth Amendment provides:

> The right of *the People* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added) The Fourth Amendment is intended to "protect the people of the United States against arbitrary action by their own Government", see *Verdugo–Urquidez,* 494 U.S. at 266, 110 S.Ct. at 1061, by striking a balance between the people's security in their persons, houses, papers, and effects, and the public's interest in effecting searches and seizures for law enforcement purposes, *see Zurcher v. Stanford Daily,* 436 U.S. 547, 559, 98 S.Ct. 1970, 1978, 56 L.Ed.2d 525 (1978) The Supreme Court has characterized the protections afforded by the Fourth Amendment as representing " 'the very essence of constitutional liberty' the guaranty of which 'is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen....'" *Ker v. State of Cal.,* 374 U.S. 23, 32, 83 S.Ct. 1623, 1629, 10 L.Ed.2d 726 (1963) (quoting in part *Gouled v. United States,* 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647 (1921)).

The Fourth Amendment does not contain any provision expressly precluding the use of evidence obtained in violation of its provisions. *See Mapp v. Ohio,* 367 U.S. 643, 661–662, 81 S.Ct. 1684, 1695, 6 L.Ed.2d 1081 (1961) (Black, J., concurring). Thus, to "effectuate the guarantees of the Fourth Amendment", the Supreme Court developed the "exclusionary rule". *See Rakas v. Illinois,* 439 U.S. 128, 134, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978). The exclusionary rule provides that evidence seized in violation of the Fourth Amendment cannot be used against the victim of an illegal search and seizure. *See Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914); *Garrett v. Lehman,* 751 F.2d 997, 1002 (9th Cir.1985). Evidence obtained as a result of an improper search and seizure is also subject to suppression as "fruit of the poisonous tree". *See Wong Sun v. United States,* 371 U.S. 471, 484–88, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963); *accord United States v. Fixen,* 780 F.2d 1434, 1438–39 (9th Cir.1986) (applying *Wong Sun* to post-arrest statements). The exclusionary rule deters violations of the Fourth Amendment by "removing the incentive to disregard it." *See Stone v. Powell,* 428 U.S. 465, 492, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976); *accord Nix v. Williams,* 467 U.S. 431, 446, 104 S.Ct. 2501, 2510, 81 L.Ed.2d 377 (1984) (recognizing that the "essential purpose" of the exclusionary rule is "to deter police misconduct.").

■ The Government contends that under the Supreme Court's decision in *Verdugo–Urquidez* and the Ninth Circuit's opinion in *Barona,* the defendant lacks standing to challenge the admissibility of evidence under the Fourth Amendment. Specifically, the Government asserts that under these cases, courts may no longer assume that the Fourth Amendment is applicable, irrespective of the defendant's citizenship. Rather, the Government argues that in the context of illegal or undocumented aliens courts are required to determine, as a threshold matter, whether a criminal defendant has a sufficient "connection" to the United States so as to fall within the ambit of the Fourth Amendment.

To place the Government's contentions in proper perspective, it is useful to review the development of constitutional jurisprudence relating to aliens. Historically, the Supreme Court has been willing to extend some constitutional protection to persons who are not citizens of the United States. The seminal case in this respect is *Yick Wo v. Hopkins,* 118 U.S. 356, 369–70, 6 S.Ct. 1064, 1070–71, 30 L.Ed. 220 (1886), in which the Court held that the Due Process Clause of the Fourteenth Amendment applies to resident aliens. Since *Yick Wo,* the Court has reaffirmed the notion that the Constitution protects citizens and aliens. *See Wong Wing v. United States,* 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (finding resident aliens are entitled to Fifth and Sixth Amendment rights); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489–90, 51 S.Ct. 229, 231, 75 L.Ed. 473 (1931) (holding that Takings and Just Compensation Clauses apply to resident aliens); *Bridges v. Wixon,* 326 U.S. 135, 148, 65 S.Ct. 1443, 1449, 89 L.Ed. 2103 (1945) (finding resident aliens are protected by First Amendment); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576 (1953) (holding that resident aliens are protected by Fifth Amendment Due Process Clause); *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) (holding that illegal aliens are protected by Equal Protection Clause under the Fourteenth Amendment).

Notwithstanding the extensive jurisprudence concerning aliens and the Constitution, neither the Supreme Court nor the Ninth Circuit has expressly extended the protections of the Fourth Amendment to both aliens and citizens alike. Rather, the Supreme Court has merely assumed for purposes of the issue *sub judice* that the Fourth Amendment affords such universal protection. *See I.N.S. v. Lopez–Mendoza,* 468 U.S.

1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). In *Lopez–Mendoza,* the Court held that illegal aliens have no right to the protections of the exclusionary rule in *civil* deportation proceedings. In reaching this conclusion, the Court assumed, without deciding, that in a criminal context, the Fourth Amendment protects illegal aliens within the United States from illegal searches and seizures. *See id.* at 1050, 104 S.Ct. at 3489.

More recently, however, the Supreme Court has cast doubt on the vitality of its assumption that the Fourth Amendment universally applies to aliens, and in particular, undocumented aliens. In *Verdugo–Urquidez,* the Court held that the Fourth Amendment does not apply to extraterritorial searches of the residences of alien defendants. *See id.* at 274–75, 110 S.Ct. at 1066. There, United States law enforcement authorities obtained an arrest warrant for the defendant, a Mexican citizen and resident. The defendant was apprehended by Mexican Police Officers and involuntarily transported to the United States, where he was arrested. Following his arrest, law enforcement officials conducted a search of his two residences in Mexico and seized evidence which implicated him in narcotics smuggling. The district court had originally ruled that the defendant's Fourth Amendment rights were violated by the DEA agents and, on that basis, granted defendant's motion to suppress. In a split decision, the Ninth Circuit affirmed. *See United States v. Verdugo–Urquidez,* 856 F.2d 1214 (9th Cir.1988), *rev'd,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).[6]

In the plurality opinion authored by Chief Justice Rehnquist, the Supreme Court reversed the Ninth Circuit and held that the Fourth Amendment does not apply to extraterritorial searches and seizures by United States law enforcement officials of property owned by a nonresident alien.[7] *See Verdu-*

---

**6.** Judge Wallace filed a lengthy dissent in which he concluded that the defendant was not entitled to Fourth Amendment protection. Based on the Fourth Amendment's express reference to "the people", Judge Wallace reasoned that "it follows that the fourth amendment extends its protective blanket to [the defendant] only if he may properly be considered one of *the people of the United States.*" 856 F.2d at 1231 (Wallace, J., dissenting) (emphasis added).

**7.** Chief Justice Rehnquist delivered the opinion of the Court, joined by Justices White, O'Connor, Scalia, and Kennedy. However, as the Court will discuss below, Justice Kennedy, in his separate concurrence, disputed, in large part, the analysis presented in the "majority" opinion, particularly with respect to whether the Fourth Amendment protects illegal aliens. Therefore, the opinion of Chief Justice Rehnquist is appro-

go–Urquidez, 494 U.S. at 261, 110 S.Ct. at 1058. In reaching this conclusion, the Court focused on both the extraterritoriality of the search and the nature of the defendant's relationship to the United States. It is the plurality's latter discussion which is the focus of the instant controversy.

In determining the reach of the Fourth Amendment, the plurality noted that the Fourth Amendment expressly affords protection to "the people", and that under the Preamble to the Constitution, "the people" means "the People of the United States". *See id.* at 265, 110 S.Ct. at 1060. Chief Justice Rehnquist then observed that the Fourth Amendment, along with the First, Second, Ninth and Tenth Amendments, refers to "the people", as contrasted with the Fifth and Sixth Amendments, which refer to "person" and "accused", respectively. *See id.* He reasoned that these textual differences were not unintentional, and that the reference to "the people" is a "term of art" which "refers to a class of persons who are part of a national community or who have otherwise developed *sufficient connection* with this country to be considered part of that community." *See id.* (emphasis added). Emphasizing his lack of connection with the United States, the Court concluded that the defendant, a nonresident alien, lacked a "sufficient connection" to this country such that he was foreclosed from asserting the shield of the Fourth Amendment. *See id.* at 271–72, 110 S.Ct. at 1064.

The *Verdugo–Urquidez* plurality then proceeded to question *Lopez–Mendoza's* previously unchallenged assumption that illegal aliens are entitled to invoke the protections of the Fourth Amendment. *See id.* 494 U.S at 272, 110 S.Ct. at 1064 ("[o]ur statements in *Lopez–Mendoza* are ... not dispositive of how the Court would rule on a Fourth Amendment claim by illegal aliens in the United States if such a claim were squarely before us."). To underscore this point, the

Court observed that *Lopez–Mendoza* "did not encompass whether the protections of the Fourth Amendment extend to illegal aliens in this country." *Id.*

Perhaps even more significantly, the Court expressly distinguished a line of cases, (e.g., *Yick Wo* and its progeny), in which it had previously held, *inter alia,* that aliens enjoy certain constitutional protections. *See id.* 494 U.S. at 271, 110 S.Ct. at 1064 The Court explained that "[t]hese cases establish only that aliens receive constitutional protections *when* they have come within the territory of the United States and *developed substantial connections with this country* ...." Respondent is an alien who has had no previous *significant voluntary connection* with the United States, so these cases avail him not. *Id.* (emphasis added).

The Supreme Court's analysis in *Verdugo–Urquidez* has renewed debate concerning the applicability of constitutional protections to illegal aliens which many thought had been settled by the Supreme Court's decision in *Plyler.* While the Ninth Circuit has not explicitly held that illegal aliens presumptively enjoy no Fourth Amendment rights, at least one panel has, in dicta, embraced the concept in principle.

This Circuit acknowledged in *Barona* that in cases involving the Fourth Amendment, a court must first determine whether persons asserting such rights "are among the class of persons that the Fourth Amendment was meant to protect." 56 F.3d at 1093. In *Barona,* three of the defendants were aliens. To determine whether these individuals were entitled to receive any protection under the Fourth Amendment, Judge Wallace, writing for the majority, noted that they must necessarily be one of "the People of the United States." *See id.* at 1093 (citing *Verdugo–Urquidez,* 494 U.S. at 265, 110 S.Ct. at 1060). "The term 'People of the United States' includes 'American citizens at home and abroad' and *lawful* resident aliens within the

priately referred to as a "plurality" decision. *See Lamont v. Woods,* 948 F.2d 825, 835 (2d Cir. 1991) (noting that "[t]o a plurality of the [*Verdugo–Urquidez* ] Court, the use of the phrase 'the people' suggested that the Framers of the Constitution intended the [fourth] amendment to apply

only to those persons who were part of or substantially connected to the national community."); *see also* Gerald Neuman, *Whose Constitution?,* 100 Yale L.J. 909, 972 (1991) (noting that Justice Kennedy's concurrence "diverged so

borders of the United States 'who are victims of actions taken *in the United States* by American officials.' " *Id.* at 1094 (quoting in part *Verdugo–Urquidez,* 856 F.2d at 1234) (Wallace, J. dissenting) (emphasis added). The *Barona* court stated that "[b]ecause our constitutional theory is premised in large measure on the conception that our Constitution is a 'social contract,' . . . 'the scope of an alien's rights depends intimately on the extent to which he has chosen to shoulder the burdens that citizens must bear.' " *Id.* at 1093 (citing *Verdugo–Urquidez,* 856 F.2d at 1236) (Wallace, J., dissenting) and *Verdugo–Urquidez,* 494 U.S. at 272–73, 110 S.Ct. at 1064–65. The court further observed that "[n]ot until an alien has assumed the *complete range of obligations* that we impose on the citizenry may he be considered one of the 'people of the United States' entitled to the full panoply of rights guaranteed by our Constitution." *Id.* at 1093–94 (citations and quotations omitted) (emphasis added).

However, as the *Barona* court acknowledged, the Supreme Court has yet to squarely address whether *illegal aliens residing within the United States* are entitled to the protections of the Fourth Amendment. *See id.* With regard to the defendants before the court, the Ninth Circuit concluded that "it is not clear . . . that Villabona or the other non-citizen defendants in this case are entitled to receive any Fourth Amendment protection whatsoever." *Id.* at 1094. However, the Ninth Circuit *expressly declined* to decide the appeal on the basis of standing. The court acknowledged that while it *"could* hold" that the non-resident defendants failed to demonstrate that they were among " 'the People of the United States' entitled to receive the full panoply of rights guaranteed by our Constitution", it ultimately determined that aside from the issue of standing, there

was no Fourth Amendment violation. *See id.* at 1094 (emphasis added).

In the instant case, the Government contends that the clear "thrust" of *Verdugo–Urquidez* and *Barona* is that "[a]n illegal alien who has not undertaken the responsibilities of citizenship should not be granted Fourth Amendment protections." (Gov't Supp. Memo. at 1.) The premise underlying the Government's interpretation of *Verdugo–Urquidez* and *Barona*—that illegal aliens must establish a substantial connection with this country before being afforded rights under the Constitution—is not entirely unprecedented.

As the Government correctly points out, both the Supreme Court and the Ninth Circuit have long recognized that the *scope* of an alien's constitutional rights are, in large part, premised on his or her connection to the United States. *See Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) ("once an alien gains admission to our country and begins to develop ties that go with permanent residence his constitutional status changes accordingly."); *Price v. U.S. I.N.S.,* 962 F.2d 836, 842 n. 6 (9th Cir.1992) ("[a]n alien is accorded a generous and ascending scale of rights as he increases his identity with our society.") (citations omitted), *cert. denied,* 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 650 (1994). The Supreme Court has similarly rejected the supposition "that all aliens are entitled to enjoy all of the advantages of citizenship, or indeed, . . . the conclusion that all aliens must be placed in a single homogeneous legal classification." *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976).[8]

---

greatly from Rehnquist's analysis and conclusions that Rehnquist seemed to really be speaking for a plurality of four.").

**8.** The instances in which aliens are not afforded rights equivalent to citizens are manifold. *See United States ex rel. Turner v. Williams,* 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904) (holding that excludable alien not entitled to assert First Amendment rights); *Foley v. Connelie,* 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (upholding restrictions on the right to vote and run for office); *see also* 8 U.S.C. § 1182 (subjecting aliens to exclusion); *id.* § 1251 (sub-

jecting aliens to deportation); 28 U.S.C. § 1865(b)(1) (imposing restrictions on jury service); 42 U.S.C. § 602(a)(33) (providing that an individual cannot be considered eligible for welfare benefits unless he or she is either a United States "citizen" or "an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law."); 42 U.S.C. § 1396b(v) (providing that no Medicaid payments "may be made to a State . . . for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.").

The above decisions, when read in tandem with *Verdugo–Urquidez* and *Barona*, provide support for the Government's position and suggest that the level of constitutional protection afforded to aliens varies commensurate with the alien's affiliation with the United States. However, the question that remains unanswered by *Verdugo–Urquidez* and *Barona* is whether an illegal alien *must* demonstrate a "connection" with this country as a prerequisite to asserting the shelter of the Fourth Amendment. Upon further review and consideration of the cases cited by the parties, as well as other authorities considered relevant and instructive, the Court concludes that, at this juncture, no such obligation exists.

Preliminarily, the Court notes that *Verdugo–Urquidez* did not *hold*—as the Government contends—that illegal aliens seeking to challenge the constitutionality of a domestic search must demonstrate a substantial connection to the United States. This is clear from the prefatory remarks circumscribing the opinion: "The question presented by this case is whether the Fourth Amendment applies to the search and seizure by United States Agents of property that is owned by a nonresident alien *and located* in a *foreign country. We hold that it does not." Verdugo–Urquidez,* 494 U.S. at 261, 110 S.Ct. at 1058 (emphasis added). The Ninth Circuit has similarly limited the holding of *Verdugo–Urquidez to extraterritorial* searches. *See United States v. Davis,* 905 F.2d 245, 251 (9th Cir.1990) ("*Verdugo–Urquidez only* held that the fourth amendment does not apply to searches and seizures of nonresident aliens in foreign countries ...."), *cert. denied,* 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991) (emphasis added).

It is also noteworthy that a majority of the justices did *not* subscribe to Chief Justice Rehnquist's opinion, particularly with respect to his discussion and analysis regarding the scope of the Fourth Amendment as it applies to illegal aliens. Although Justice Kennedy joined in the Chief Justice's opinion and agreed that no violation of the Fourth

Amendment had occurred, he filed a separate concurrence which diverged, in large part, from the "majority" opinion. In his concurrence, Justice Kennedy expressly *rejected* the Chief Justice's distinction between "the people" and "persons" in circumscribing the force and reach of the Fourth Amendment. *See Verdugo–Urquidez,* 494 U.S. at 276, 110 S.Ct. at 1066, (Kennedy, J., concurring). Perhaps of even more importance is Justice Kennedy's opinion that "[i]f the search had occurred in a residence within the United States, *I have little doubt that the full protections of the Fourth Amendment would apply." Id.* at 278, 110 S.Ct. at 1067 (emphasis added).[9]

The fact that a majority of the justices disagreed with the analysis advanced by Chief Justice Rehnquist is significant, as the Ninth Circuit does not construe Supreme Court plurality decisions as *binding* precedent. *See Jacobsen v. U.S. Postal* Service, 993 F.2d 649, 655 (9th Cir.1992) ("[t]he Ninth Circuit has not taken pluralities as being controlling."). It is also noteworthy that the Ninth Circuit has been presented with the opportunity to adopt the *Verdugo–Urquidez* plurality opinion and to require that illegal aliens demonstrate some relationship with the United States as a prerequisite to asserting rights protected by the Fourth Amendment, *but has declined to do so. See Barona,* 56 F.3d at 1094 (declining to decide motion to suppress on standing grounds). As such, it is readily apparent that neither *Verdugo–Urquidez* nor any Ninth Circuit authority *mandates* a new Fourth Amendment analytical framework with respect to illegal aliens.

Moreover, after extensive further deliberation, the Court finds that there are compelling reasons which militate against attempting to divine a rule which governs *domestic* searches involving illegal immigrants *premised on these cases.* It is unclear from *Verdugo–Urquidez* that the plurality adopted a new "standard", and if it did, the specific parameters of such standard. Throughout the opinion, the Court employs nomenclature

---

**9.** Justice Stevens declined to "join in the [plurality's] sweeping opinion" and concurred in the judgment only. *Verdugo–Urquidez,* 494 U.S. at 279, 110 S.Ct. at 1068 (Stevens, J., concurring).

He reasoned that the Fourth Amendment applied but that its requirements were met under the facts presented. *Id.* Justices Brennan, Marshall, and Blackmun dissented.

which is similar—but not synonymous—to describe the requisite relationship an illegal alien must establish to avail himself of the protection of the Fourth Amendment. *Compare Verdugo–Urquidez* 494 U.S. at 265, 110 S.Ct. at 1060 (referring to a "class of persons who are *part of a national community* or who have otherwise developed *sufficient* connection with this country to be considered a part of that community.") (emphasis added), with *id.* at 271, 110 S.Ct. at 1064 (discussing "*substantial* connections with this country" and "*significant voluntary* connection with the United States") (emphasis added). Perhaps even more significantly, the plurality opinion fails to articulate the nature and extent of the "connection" entitling this category of persons to the protection of the Fourth Amendment.

It is against this backdrop of uncertainty that the Government urges the Court to distill a rule from *Verdugo–Urquidez* and *Barona* which is tantamount to a presumption that this class of individuals is not entitled to the protections guaranteed by the Fourth Amendment. The Court declines to do so. Given the lack of any clear appellate guidance which alters the applicable standard or otherwise sets forth a definitive analysis in making these vital determinations, the Court is disinclined to impose a greater burden on this category of criminal defendants as a prerequisite to seeking the shelter of the Fourth Amendment. To adopt the Government's position that illegal aliens presumptively enjoy no Fourth Amendment protection would require federal courts, without any consistent or clear standard, "to jump into a quagmire of weighing relative 'societal obligations' in determining the applicability of the Fourth Amendment to illegal aliens within the United States." R.K. Miller, *The Limits of U.S. International Law Enforcement After Verdugo–Urquidez: Resurrecting Rochin,* 58 U. Pitt. L.Rev. 867 (1997); *c.f., Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1990) ("when governing decisions are unworkable or badly reasoned 'this Court has never felt constrained to follow precedent.'") (quoting in part *Smith v. Allwright,* 321 U.S. 649, 665, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944)).

Gauging the precise impact of the above concerns is difficult, at best. Nevertheless, it is readily apparent that existing Fourth Amendment jurisprudence would suffer by allowing law enforcement officers and reviewing courts to exercise unfettered discretion in deciding to whom and under what circumstances the Fourth Amendment should be applied. Indeed, the lack of clear and objective standards is certain to add to the confusion and is likely to deprive law enforcement officers of the facility to discharge their duties within the confines of the Constitution. Such a result could have a pernicious impact on the administration of justice.

Not only would the resulting confusion prove arduous for law enforcement officers and the courts, it is antithetical to the purpose and intent of the Fourth Amendment. As noted, the Fourth Amendment's central function is to protect against arbitrary government action. *See Verdugo–Urquidez,* 494 U.S. at 266, 110 S.Ct. at 1061. In furtherance of this goal, the exclusionary rule serves as a prophylactic measure intended, in part, to remove the incentive on the part of law enforcement officers to disregard an individual's rights under the Fourth Amendment. *See Nix,* 467 U.S. at 446, 104 S.Ct. at 2510; *see also* J. Ricchezza, *Are Undocumented Aliens "People" Persons Within the Context of the Fourth Amendment?,* 5 Geo. Immigr. L.J. 475, 483–84 (1991). Without clear and consistent judicial guidance, however, the inviolable protections traditionally afforded to persons accused of criminal conduct, including resident aliens and those who "appear" to be aliens, will undoubtedly be undermined.

Given the significance of the issues, the paucity of authority and the expansive implications, the Court declines to fashion such a dramatic modification to the Fourth Amendment analysis which has not been clearly sanctioned by the Supreme Court. The Court therefore finds that the defendant has standing to assert a violation of the Fourth Amendment, and hence, now turns to the merits of his motion to suppress.

**B. *MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MITCHELL WAY RESIDENCE***

### 1. *Applicable Law*

 Defendant moves to suppress evidence seized from the Mitchell Way resi-

dence pursuant to the search warrant, statements made during the search, and all post-arrest statements. "The validity of the search warrant depends on the sufficiency of what is found within the four corners of the underlying affidavit." *United States v. Taylor*, 716 F.2d 701, 705 (9th Cir.1983) (citations omitted) The affidavit is sufficient if it establishes probable cause. *See id.*

■ "A magistrate judge may issue a search warrant if, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular location." *See United States v. Clark*, 31 F.3d 831, 834 (9th Cir. 1994), *cert. denied*, 513 U.S. 1119, 115 S.Ct. 920, 130 L.Ed.2d 800 (1995); *accord United States v. Ramos*, 923 F.2d 1346, 1351 (9th Cir.1991). Direct evidence that contraband or evidence will be found at the place to be searched is not necessary to establish probable cause. *See United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986) (citations omitted). The magistrate is entitled to "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of the offense." *Id.* With respect to drug dealers, the Ninth Circuit has recognized that "evidence is likely to be found where the dealers live." *United States v. Gil*, 58 F.3d 1414, 1418–19 (9th Cir.) *cert. denied*, — U.S. —, 116 S.Ct. 430, 133 L.Ed.2d 345 (1995) (citation and quotations omitted).

■ Notwithstanding the above, the facts set forth in a search warrant affidavit must establish a "reasonable nexus" between the allegedly criminal activity and the place to be searched. *See United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir.1993); *United States v. Hove*, 848 F.2d 137, 140 (9th Cir.1988) (finding search of the defendant's residence improper where "[t]he affidavit [did] not link this location to the defendant and ... [did] not offer an explanation of why the police believed they may find incriminating evidence there"). "Probable cause to believe that a suspect has committed a crime is *not* by itself adequate to secure a search warrant for the suspect's home." *Ramos*, 923 F.2d at 1351.

### 2. *Contentions*

Defendant contends that, assuming arguendo that he was involved in a drug transaction at the Birrieria Jalisco Restaurant, none of the information presented in Agent Rodriguez' search warrant affidavit is sufficient to establish probable cause that contraband or evidence would be found at 1091 Mitchell Way. (Def.'s Mot. at 5–8.) Alternatively, defendant contends that even if the affiant presented facts sufficient to demonstrate a nexus between the defendant and 1091 Mitchell Way, such information was "stale" when the warrant was issued on May 2, 1996 and executed on May 9, 1996.

Although the Government does not dispute that *there is no evidence of any criminal activity having occurred at 1091 Mitchell Way*, the Government asserts that the search was proper because "there was probable cause to believe that Guitterez lived there." (Gov't Mem. at 12.) In support of this proposition, the Government cites the fact that (1) defendant informed CHP Officer Verduzco that he lived in El Sobrante and then later drove there with Ruvalcaba and their child and (2) defendant used a garage door opener to open the garage door which "clearly suggested that was his home." (*Id.*) The Government further contends that Judge Sing properly inferred, based on Agent Rodriguez's expert opinion, that since defendant was involved in drug trafficking, evidence and/or contraband would be found at 1091 Mitchell Way, his alleged residence. (*Id.*)

### 3. *Nexus to 1091 Mitchell Way*

■ The Ninth Circuit has held that in determining whether an affidavit establishes probable cause, a magistrate may consider an expert's opinion. *See United States v. Seybold*, 726 F.2d 502, 504–505 (9th Cir.1984). Thus, Judge Sing could properly rely upon Agent Rodriguez's opinion that narcotics dealers often store narcotics and narcotics-related equipment and paraphernalia at their residences. *See id.* However, the affidavit in this case contains insufficient information to establish a "fair probability" that the defendant actually lived at the residence at 1091 Mitchell Way.

As a threshold matter, the fact that the defendant informed CHP Officers Verduzco and Lebell during the traffic stop that he lived "in El Sobrante" and, one hour and one stopover [10] later, drove to a house located in El Sobrante does not establish that the defendant actually resided at that particular address. Indeed, based on the representations made to the CHP officers, the defendant might have lived in any one of the multitude of residences located in El Sobrante.

Equally unpersuasive is the Government's assertion that "Guitterez's use of a garage door opener at Mitchell Way clearly suggested that was his home." (Gov't Mem. at 12.) [11] The Government ignores that the record is unclear whether defendant actually operated a garage door opener at 1091 Mitchell Way. As discussed above, the affidavit submitted to Judge Sing by Agent Rodriguez is internally inconsistent concerning *who* operated the garage opener. (*Compare* Aff. at 13 ("Burns observed GUITTEREZ operate a remote control garage opener"), *with id.* at 23 ("Javier GUITTEREZ *and* Delia RUVALCABA were observed opening the garage door with a remote garage door opener") (emphasis added).) [12]

Aside from the above inconsistencies, even if defendant did activate a remote control garage door opener, the Government has cited no legal authority for the proposition that the *single* operation of a garage door opener is sufficient to *establish* probable cause that the operator resides there. Although it is axiomatic that an owner of property or one who resides there will exercise possession and control over instruments necessary to facilitate entry, (e.g., keys, garage door openers, etc.), the Court is not convinced that the converse is always true. Clearly, not every person who has access to a residence resides there or possesses a "proprietary interest, therein—as in the case of relatives, neighbors, housekeepers, housesitters, or other service persons." Nor is the Court convinced that the law enforcement officers' alleged observation of defendant's use of a remote control device on a single occasion sufficiently establishes a probability that defendant resided at 1091 Mitchell Way.

The Court also notes that the affidavit is devoid of information regarding any further surveillance of 1091 Mitchell Way. There were, ostensibly, no additional observations, and thus, there is no additional evidence which might establish that the defendant lived at 1091 Mitchell Way. To the contrary, the information presented is directly at odds with this conclusion. First, the information obtained by the affiant and set forth in the search warrant affidavit disclosed to the magistrate that the *defendant resided at 1128 D Street in Hayward.* Notably, there is no information in the affidavit regarding any investigation of the Hayward address. Second, the utilities for 1091 Mitchell Way were registered in the names of persons *other than* the defendant or his wife.[13] The

---

10. After the traffic stop, Guitterez, Ms. Ruvalcaba, and the child went directly to 1640–17th Street #3, San Pablo, California, spending approximately twenty minutes inside that apartment, before proceeding to 1091 Mitchell Way.

11. The Government also argues that the defendant's alleged use of a garage door opener demonstrates that "he had a significant proprietary interest in the home." (Gov't Mem. at 11.) There is no evidentiary or legal basis for this conclusion.

12. The Court's analysis of probable cause is restricted to the contents of the search warrant affidavit. However, the Court notes that Agent Burns' account of how they entered the garage is, at best, equivocal. (*See* Singer Decl. ¶ 18 ("[Burns] saw the vehicle go into the garage by use of what *appeared to be a garage door opener* and then saw the garage door close ....") (emphasis added).) Notably, Agent Burns—upon whose observations the affiant relied—makes no representation that there was a garage door opener and, if so, the identity of the person using it.

13. The Government, relying on *United States v. Weaver,* 99 F.3d 1372, 1379 (6th Cir.1996) and *United States v. DiCesare,* 765 F.2d 890, 899 (9th Cir.), *amended,* 777 F.2d 543 (9th Cir.1985), dismisses the fact that the utilities were in the name of persons other than the defendant as "insignificant." (Gov't Mem. at 13.) This contention is misplaced. These authorities merely recognize the fact that a defendant who was the utilities account holder, by itself, was *insufficient* to support a showing of probable cause to search that residence. *See Weaver,* 99 F.3d at 1379; *DiCesare,* 765 F.2d at 899. Indeed, these cases detract from—rather than support—the Government's position.

affidavit also states that the brown Mercury Cougar driven by the defendant and later parked in the Mitchell Way garage was not his own. Rather, this vehicle was registered to Miguel Angel Martinez, 1401 Emeric Avenue, *San Pablo,* California. (Aff. at 17.) Nor did Guitterez own the 1988 Hyundai which, according to the affiant, was parked in the Mitchell Way driveway when the defendant arrived. (*Id.* at 13.) This vehicle was registered to Gerardo Lizade with the address of 2208 Emeric Avenue # C in the city of *San Pablo.* (*Id.* at 16.)

Given the absence of evidence establishing a probability that the defendant lived at 1091 Mitchell Way—or that he possessed a "significant proprietary interest" in the property—the Court finds that the affidavit relied upon by Judge Sing failed to establish a reasonable nexus between the defendant's alleged illegal activity and the place to be searched.

#### 4. *Staleness*

■ Defendant next argues that even if the affidavit was sufficient to establish the requisite nexus between the defendant and 1091 Mitchell Way, such information was "stale" when the search warrant was issued 15 days later on May 2, 1996, and 22 days later when it was executed on May 9, 1996. The timeliness of a warrant depends on whether it is reasonable to believe that items to be seized are still on the property. *See United States v. Gann,* 732 F.2d 714, 722 (9th Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984). The mere lapse of time is not controlling. *See Pitts,* 6 F.3d at 1369.

■ The Government does not dispute Agent Rodriguez's failure to present information to Judge Sing to support his belief that "pay money" from a narcotics transaction which transpired over two weeks earlier would still be in the place to be searched. (Aff. at 26–27.) Instead, the Government contends that the information contained in the search warrant affidavit was not stale because the agents were continuing their investigation after the controlled purchase at the Birrieria Jalisco Restaurant on April 17,

1996. However, none of the information gleaned as a result of that investigation supported the conclusion that defendant resided at 1091 Mitchell way nor reinforced the supposition that evidence would be discovered at that location. *See United States v. Vaandering,* 50 F.3d 696, 700 (9th Cir.1995) (noting that stale information may provide a basis for probable cause if it is coupled with recent corroborating information).

■ The Government also asserts that the defendant was involved in an ongoing drug business. Although "staleness arguments lose much of their force" where the affidavit indicates "a widespread, firmly entrenched, and ongoing narcotics operation", *United States v. Dozier,* 844 F.2d 701, 707 (9th Cir.), *cert. denied,* 488 U.S. 927, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988), the evidence cited by the Government for this proposition pertains to Torres, not to the defendant. The Court therefore finds that the delay in obtaining and executing the search warrant negated any showing of probable cause to search 1091 Mitchell Way because the information was stale.

#### 5. *Good Faith Exception*

The Government contends that even if Judge Sing lacked probable cause to issue the warrant, the search should be upheld under the "good faith" exception to the warrant requirement, pursuant to *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon,* the Supreme Court held that evidence obtained under a *facially valid* warrant, which is later found invalid, is admissible if the executing officers acted in good faith and had an "objectively reasonable belief in the existence of probable cause." *See id.* at 926, 104 S.Ct. at 3422.

■ However, "[a]n officer does not manifest objective good faith in relying on a warrant based on an affidavit that is so lacking in indicia of probable cause that official belief in its existence is entirely unreasonable." *See United States v. Fowlie,* 24 F.3d 1059, 1067 (9th Cir.1994) (citing *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420).[14] An officer's

---

**14.** *"Leon* distinguished between warrants that

are facially invalid for lack of particularity and

reliance will be deemed reasonable if the affidavit supporting the warrant could "create disagreement among thoughtful and competent judges as to the existence of probable cause." *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422. "The government bears the burden of proving that reliance upon the warrant was objectively reasonable." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir.1995) (citation omitted).[15]

The Ninth Circuit has consistently held that *Leon*'s good faith exception is inapplicable where the search warrant affidavit fails to demonstrate a nexus between the defendant and the place to be searched. For example, in *Hove*, the court observed that:

> The affidavit does not link [the location to be searched] to the defendant and it does not offer an explanation as to why the police believed they may find incriminating evidence there; the affidavit simply lists the DeAnza address as a location to be searched. *It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched.* [citation] No such facts were stated in this affidavit. Thus, *any official belief in the existence of probable cause must be considered unreasonable.*

848 F.2d at 140 (emphasis added). The court concluded that "[w]here the officers have not presented a colorable showing [of probable cause], and the warrant and affidavit on their face preclude reasonable reliance, the reasoning of *Leon* does not apply." *Id.*

Similarly, in *United States v. Holzman*, 871 F.2d 1496 (9th Cir.1989), the search warrant affidavit noted that a financial advisor's business card had been found on the defendant's person and from this the affiant concluded that the items likely to be found at the place to be searched included "jewelry, bonds and notes obtained through [a] fraud scheme." *Id.* at 1511. The court reviewed the affidavit and found that "if there was a nexus between the presence of an investment

advisor business card and the existence of bonds and notes, that *nexus was so tenuous and speculative* that it could not have operated as a substantial basis for believing that bonds would be found." *Id.* In addition, the court held that "the evidence purported to justify the search was so tenuous that no reasonable police officer could have believed *that portion of the warrant* was supported by probable cause. Therefore, the 'good faith' exception to the valid warrant requirement ... cannot be applied to overcome the warrant's deficiency as to the bonds." *Id.* at 1511 n. 4.

As in *Hove* and *Holzman*, the evidence proffered to justify the search of 1091 Mitchell Way is both tenuous and speculative. The *only* information ostensibly linking the defendant to 1091 Mitchell Way was his statement to CHP officers that he resided in El Sobrante and the agent's *controverted* observation that the defendant appeared to have opened the garage door. No reasonable law enforcement officer could manifest an objective belief that this information, *standing alone*, was sufficient to establish probable cause to search 1091 Mitchell Way, particularly given the fact that the *only* objectively verifiable evidence in the affidavit regarding defendant's address indicated that he resided in the city of *Hayward*. And while an affiant may properly opine, based on his knowledge and experience, that narcotics suppliers secrete evidence of illegal activity at their residences, to conclude on these meager facts that defendant lived at 1091 Mitchell Way is entirely speculative. *See Leon*, 468 U.S. at 923, 104 S.Ct. at 3420; *Hove*, 848 F.2d at 139.

Further, the Court finds that the good faith exception is inapplicable, as Agent Rodriguez was both the affiant and the law enforcement officer leading the execution of the search. *See United States v. Baxter*, 889 F.2d 731, 734 (6th Cir.1989) (declining to apply *Leon* where the officer executing the warrant also provided the deficient informa-

---

those so lacking in indicia of probable cause as to render an officer's belief in its existence 'entirely reasonable.'" *Ortiz v. Van Auken*, 887 F.2d 1366, 1370–71 (9th Cir.1989).

**15.** The Government's assertion that the *defendant* "has not met his burden under *Leon*" is an incorrect statement of the law. (Gov't Mem. at 16.)

tion in the search warrant affidavit) Given the serious deficiencies in the affidavit, it is apparent that a reasonably well-trained officer would have known that the search warrant was deficient, notwithstanding Judge Sing's authorization. The Government has failed in its burden of proving that reliance upon the warrant was in good faith and objectively reasonable.[16]

### 6. *Conclusion*

Based on the above, the Court finds that the exclusionary rule requires that all evidence seized from 1091 Mitchell Way be suppressed from introduction against defendant Guitterez. Since all statements and admissions purportedly made by defendant Guitterez on May 9, 1996, during and/or after the search of 1091 Mitchell Way are tainted by this illegal search, they must be suppressed as well.[17] Defendant's motion to suppress evidence seized at 1091 Mitchell Way on May 9, 1996 and statements and admissions which he made on and after that date is GRANTED.

### C. *MOTION TO SUPPRESS OBSERVATIONS MADE AND STATEMENTS OBTAINED DURING THE WARRANTLESS TRAFFIC STOP ON APRIL 17, 1996*

Defendant next moves to suppress statements obtained and observations made by the CHP officers during the traffic stop of the Mercury Cougar on April 17, 1996, on the ground that the officers lacked probable cause to effect a lawful traffic stop. The

Government responds that the stop was proper because the officers had reasonable suspicion to stop the vehicle based on a traffic violation, to wit, Ruvalcaba's failure to wear her seatbelt. (Gov't Mem. at 23–26.)[18]

 It is well settled that law enforcement officers may conduct a traffic stop where they have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations" relating to the operation of motor vehicles. *See Delaware v. Prouse,* 440 U.S. 648, 655–56, 99 S.Ct. 1391, 1396–97, 59 L.Ed.2d 660 (1979); *accord United States v. Gutierrez–Mederos,* 965 F.2d 800, 803 (9th Cir.1992) (noting that a traffic violation "in itself provided founded suspicion for a brief investigatory stop."), *cert. denied,* 507 U.S. 932, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993). When conducting a lawful traffic stop, the officer may, as a reasonable safety measure, require the passenger or passengers to leave the car. *See Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977); *see also United States v. Cannon,* 29 F.3d 472, 476–77 (9th Cir.1994) ("Once [the defendant] was validly stopped, [the officer] properly asked [the defendant] to exit his car."). The officer may also conduct a limited pat search to ensure his or her safety. *See Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968).

 The Government argues that the traffic stop was proper because Ruvalcaba, the only adult female passenger in the Cou-

---

**16.** Although neither party discusses the point in the context of *Leon,* the Court notes that the fact that Judge Sing granted the search warrant after requesting Agent Rodriguez to augment his affidavit with hand-written statements does not render the officer's belief in probable cause *to search the Mitchell Way address* any more reasonable. Aside from the conclusory and speculative nature of the supplemental statements, none of them refer to the Mitchell Way residence or to defendant's alleged connection to that property. Moreover, since "[t]he *Leon* test for good faith reliance is clearly an *objective* one", *Hove,* 848 F.2d at 140 (emphasis added), it is readily apparent that no reasonable officer would have objectively believed that Judge Sing's granting of the warrant after the affidavit was augmented was *sufficient to confirm the existence of probable cause.*

**17.** In light of the above conclusions, the Court does not reach defendant's contention that the affiant made material misstatements and omissions within the meaning of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**18.** The Government also contends that the officers had probable cause to believe that the vehicle contained "buy money", i.e., the state-recorded funds allegedly received by the defendant at the Birrieria Jalisco Restaurant. However, in light of the Court's determination that the stop was based on a suspected traffic infraction, the Court does not reach the Government's alternative contention.

gar, was not wearing her seatbelt. *See* Cal. Veh.Code § 27315 (requiring driver and passengers to wear seatbelts). The Court agrees. The record indicates that Agent Van Dorn, who had surveilled the activities at the Birrieria Jalisco Restaurant, informed Officer Verduzco, one of the officers who effected the traffic stop, that surveillance personnel had advised that a passenger riding in the vehicle was not wearing a seatbelt.[19] (*See* Narrative/Supplemental Report.) After stopping the vehicle, Officer Verduzco personally observed the female adult passenger in the right rear seat not wearing a seatbelt. (*Id.*)

Defendant contends that there is a factual dispute concerning this issue and that an evidentiary hearing is necessary to resolve the matter. An evidentiary hearing in connection with a motion to suppress is appropriate "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue." *See United States v. Wilson,* 7 F.3d 828, 834 (9th Cir.1993), *cert. denied,* 511 U.S. 1134, 114 S.Ct. 2151, 128 L.Ed.2d 877 (1994) (citation and quotations omitted).

In support of his request for an evidentiary hearing, defendant points to his third declaration in which he states that "*[a]t the time of the stop* I was wearing my seat belt and *just prior to the stop* my passenger was wearing her seat belt" (Third Guitterez Decl. ¶ 3.)[20] However defendant's declaration is insufficient to establish a factual dispute requiring an evidentiary hearing. As an initial matter, the Court notes that defendant pro-

vides no factual foundation for his conclusion that Ruvalcaba was wearing her seatbelt "just prior to the stop". It is uncontroverted that Ruvalcaba was seated in the right *rear* seat. Yet, defendant, who was driving the vehicle, fails to provide any facts demonstrating his ability to observe—or that he, in fact, observed—the seatbelt status of a passenger located behind him.

█ Aside from the lack of foundation to support defendant's conclusions, the information set forth in defendant's declaration is insufficient to justify an evidentiary hearing. As discussed above, Officer Verduzco was advised that one of the passengers in the vehicle driven by the defendant was not wearing her seatbelt. Defendant provides no controverting factual information. His assertion that Ruvalcaba was wearing her seatbelt *"just before* the traffic stop", (Third Guitterez Decl. ¶ 3 (emphasis added)), is simply too vague to create a material factual dispute requiring an evidentiary hearing. See *Shah v. United States,* 878 F.2d 1156, 1161 (9th Cir.) (holding that an evidentiary hearing is not necessary where the defendant's allegations are "vague and conclusory."), *cert. denied,* 493 U.S. 869, 110 S.Ct. 195, 107 L.Ed.2d 149 (1989).

█ Defendant next argues that even if the stop were proper, Officer Verduzco had no right to conduct a pat search for identification. However, defendant ignores that Officer Verduzco conducted the pat search for safety reasons, not for identification.[21] In any event, since the defendant was unable to produce a driver's license or vehicle registration, it was permissible for the officers effect-

---

**19.** That Officer Verduzco may not have personally confirmed this fact prior to the stop is inapposite. *See United States v. Garza,* 980 F.2d 546, 550 (9th Cir.1992) (the officer conducting a stop "need not have personal knowledge of the facts" supporting a showing of probable cause and probable cause "may be based on the collective knowledge of all the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom.") (citations and quotations omitted).

**20.** The Court notes that the Government, in its *initial* response to the motion to suppress, clearly stated that the traffic violation was based on Ruvalcaba's failure to wear a seatbelt. (Gov't

Mem. at 26.) However, in his declaration filed *after* the Government submitted its brief, the defendant declared only that *he* was wearing his seatbelt at the time of the stop. (First Guitterez Decl. ¶ 3). Notably, defendant was silent as to whether any of his passengers were properly wearing their seatbelts. (*Id.*)

**21.** Although the search warrant affidavit prepared by Agent Rodriguez characterizes it as a pat search "for identification", the Court notes that it was Officer Verduzco—not Agent Rodriguez—who actually conducted the search. Consequently, the Court credits Officer Verduzco's stated purpose of the search over that of Agent Rodriguez.

ing the stop to request the defendant to exit the vehicle and to conduct a pat search. *See United States v. Thompson,* 597 F.2d 187, 190 (9th Cir.1979) (upholding a protective pat search of a driver who was pulled over for traffic infractions and who was unable to produce a driver's license).

The Court concludes that the traffic stop was proper and that statements obtained and observations made as a result of the stop need not be suppressed.[22] Therefore, defendant's motion to suppress observations made and statements obtained during the warrantless traffic stop on April 17, 1996 is DENIED.

### CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT the Court's Order of October 16, 1997 is VACATED. Defendant's Motion to Suppress is GRANTED, in part, and DENIED, in part, as set forth above. The parties shall appear before the Court on *February 24, 1998* at 9:30 a.m. for status.

IT IS SO ORDERED.

---

**22.** The Court notes that the search warrant affidavit is deficient, regardless of whether the evidence and statements resulting from the traffic stop is suppressed.